UNIROYAL GOODRICH TIRE COMPANY, Petitioner,

v.

Roberto O. MARTINEZ and Juanita Martinez, Individually and as next friends of Robert Martinez, Jr., and John Mathew Martinez, Minors, Respondents.

No. 95–1159.

Supreme Court of Texas.

Argued Oct. 2, 1996.

Decided Oct. 15, 1998.

Rehearing Overruled Nov. 12, 1998.

John B. Kyle, Jack Pew, Jr., Dena L. Mathis, Frank C. Vecella, Dallas, for Petitioner.

Steve T. Hastings, Corpus Christi, Todd W. White, Rockwall, Karen Kennedy, Corpus Christi, Revecca E. Hamilton, Rockwall, Guy H. Allison, Corpus Christi, for Respondents.

PHILLIPS, Chief Justice, delivered the opinion of the Court, in which GONZALEZ, SPECTOR, ABBOTT and HANKINSON, Justices, join.

Petitioner's motion for rehearing is overruled. We withdraw our opinion of July 3, 1998, and substitute the following opinion.

We must decide whether a manufacturer who knew of a safer alternative product design is liable in strict products liability for injuries caused by the use of its product that the user could have avoided by following the product's warnings. The court of appeals held that the mere fact that a product bears an adequate warning does not conclusively establish that the product is not defective. 928 S.W.2d 64. Because we agree, we affirm the judgment of the court of appeals.

## I

Roberto Martinez, together with his wife and children, sued Uniroyal Goodrich Tire Company ("Goodrich"), The Budd Company, and Ford Motor Company for personal injuries Martinez suffered when he was struck

by an exploding 16" Goodrich tire that he was mounting on a 16.5" rim. Attached to the tire was a prominent warning label containing yellow and red highlights and a pictograph of a worker being thrown into the air by an exploding tire. The label stated conspicuously:

### DANGER

NEVER MOUNT A 16" SIZE DIAMETER TIRE ON A 16.5" RIM. Mounting a 16" tire on a 16.5" rim can cause severe injury or death. While it is possible to pass a 16" diameter tire over the lip or flange of a 16.5" size diameter rim, it cannot position itself against the rim flange. If an attempt is made to seat the bead by inflating the tire, the tire bead will break with explosive force.

. . .

NEVER inflate a tire which is lying on the floor or other flat surface. Always use a tire mounting machine with a hold-down device or safety cage or bolt to vehicle axle.

NEVER inflate to seat beads without using an extension hose with gauge and clip-on chuck.

NEVER stand, lean or reach over the assembly during inflation.

. . .

Failure to comply with these safety precautions can cause the bead to break and the assembly to burst with sufficient force to cause serious injury or death.

Unfortunately, Martinez ignored every one of these warnings. While leaning over the assembly, he attempted to mount a 16" tire on a 16.5" rim without a tire mounting machine, a safety cage, or an extension hose. Martinez explained, however, that because he had removed a 16" tire from the 16.5" rim, he believed that he was mounting the new 16" tire on a 16" rim. Moreover, the evidence revealed that Martinez's employer failed to make an operable tire-mounting machine available to him at the time he was injured, and there was no evidence that the other safety devices mentioned in the warning were available.

In their suit, the Martinezes did not claim that the warnings were inadequate, but instead alleged that Goodrich, the manufacturer of the tire, Budd, the manufacturer of the rim, and Ford, the designer of the rim, were each negligent and strictly liable for designing and manufacturing a defective tire and rim. Budd and Ford settled with the Martinezes before trial, and the case proceeded solely against Goodrich.

At trial, the Martinezes claimed that the tire manufactured by Goodrich was defective because it failed to incorporate a safer alternative bead design that would have kept the tire from exploding. This defect, they asserted, was the producing cause of Martinez's injuries. Further, they alleged that Goodrich's failure to adopt this alternative bead design was negligence that proximately caused Martinez's injury.

The bead is the portion of the tire that holds the tire to the rim when inflated. A bead consists of rubber-encased steel wiring that encircles the tire a number of times. When the tire is placed inside the wheel rim and inflated, the bead is forced onto the bead-seating ledge of the rim and pressed against the lip of the rim, or the wheel flange. When the last portion of the bead is forced onto this ledge, the tire has "seated," and the air is properly sealed inside the tire. The bead holds the tire to the rim because the steel wire, unlike rubber, does not expand when the tire is inflating. The tire in this case was a 16" bias-ply light truck tire with a 0.037" gauge multi-strand weftless bead, or tape bead, manufactured in 1990. A tape bead consists of several strands of parallel unwoven steel wires circling the tire with each layer resting on top of the last, similar to tape wound on a roll. After a number of layers have been wound, the end of the bead is joined, or spliced, to the beginning of the same bead to form a continuous loop.

The Martinezes' expert, Alan Milner, a metallurgical engineer, testified that a tape bead is prone to break when the spliced portion of the bead is the last portion of the bead to seat. This is commonly called a

hang-up. Milner testified that an alternative bead design, a 0.050" gauge single strand programmed bead, would have prevented Martinez's injuries because its strength and uniformity make it more resistant to breaking during a hang-up. Milner explained that the 0.050" single strand programmed bead is stronger because it is 0.013" thicker and that it is uniform because it is wound, or programmed, by a computer, eliminating the spliced portion of the bead that can cause the tire to explode during a hang-up.

According to Milner, Firestone was the first to document that tape beads were prone to break during hang-ups in a 1955 patent application. This application, which was granted three years later, stated in part:

> It has developed that in tires of the type now in common use that the grommet of wire used becomes ruptured or broken too frequently at or near the end of the wire splice when the tire bead is forced onto the rim bead seat during mounting of the tire. Applicant has discovered that such breaking of the bead wire occurs most frequently when the spliced portion of the bead wire grommet is located in the last portion of the tire bead to be seated on the rim, and they have noted that when an end of the said wire ribbon was disposed on the radial inner surface of the bead grommet that the break started at or adjacent to that point.

Milner testified that the design of the bead in the Goodrich tire in question was the same design criticized in the patent. Milner also testified, relying on an internal memorandum that was admitted into evidence, that in 1971 General Tire, one of Goodrich's competitors, knew its tape bead design was prone to break during hang-ups.

In 1966, 16.5" wheel rims were first introduced into the American market.[1] Milner testified that Uniroyal, Inc. and B.F. Goodrich Company, who in 1986 merged to form Goodrich, soon became aware that mismatching their 16" tires with the new wheel rims often caused hang-ups that resulted in broken beads. The minutes of a 1972 meeting

of the Rubber Manufacturers Association ("RMA"), of which both Uniroyal, Inc. and B.F. Goodrich were members, provided:

> Mounting of LT [light truck] tires. Attention was drawn to reports that there have been instances where 16" LT tires have been mounted on 16.5" rims and 14" tires on 14.5" rims. It was proposed and approved to request the Service Managers Committee to add a cautionary statement to RMA documents.

Similarly, the minutes from a 1972 meeting of the Tire and Rim Association, of which Uniroyal, Inc. and B.F. Goodrich were both members, provided:

> It was reported that there have been incidents where 14" and 16" tires have been mounted on 14.5" and 16.5" rims that have resulted in broken beads. The Rim Subcommittee of the Technical Advisory Committee was requested to consider some method of marking 15" Drop Center rims and wheels to avoid this practice.

Finally, Milner testified that B.F. Goodrich's own testing department was aware by at least 1976 that a 16" tire mounted on a 16.5" rim would explode during a hang-up. A B.F. Goodrich "test request" of that year was entered into evidence indicating that a 16" tire would explode when mounted on a 16.5" rim at 73 psi (pounds of pressure per square inch). The test request further indicated that "inspection revealed break was at [illegible] ends of bottom layer of [bead] wires as anticipated." The stated "Object of Test" was: "To develop demonstrative evidence & data for use in lawsuits involving broken beads."

Milner explained that the computer technology required to manufacture the programmed bead was developed in 1972 and widely available by 1975. Milner testified that Goodyear began using a 0.051" gauge single strand programmed bead in its radial light truck tires in 1977, and that Yokohama began using a single strand programmed bead in its radial light truck tires in 1981. Milner also testified that General Tire began

---

1. The rim involved in this case was manufactured in 1979. The Budd Company ceased man- ufacturing 16.5" rims in 1983.

using a single strand programmed bead in its bias-ply light truck tires in 1982. Finally, Milner testified that Goodrich itself began using the single strand programmed bead in its 16" radial light truck tires in 1991.[2] Based upon this evidence and his expert opinion, Milner testified that the tire manufactured by Goodrich with a tape bead was defective and unreasonably dangerous. Because Goodrich had also been sued in thirty-four other lawsuits alleging accidents caused by mismatching Goodrich tires, Milner asserted that Goodrich was grossly negligent in failing to adopt the 0.050" single strand programmed bead in it bias-ply 16" light truck tires.

Milner also testified that the rim designed by Ford and manufactured by Budd was defective because its size was not clearly marked on it and because it could have been redesigned to prevent a 16" tire from passing over its flange.

The jury found that Goodrich's conduct was the sole proximate cause of Martinez's injuries and that Goodrich was grossly negligent. Furthermore, the jury found that the tire manufactured by Goodrich was defective, while the wheel rim designed by Ford and manufactured by Budd was not defective. The jury allocated 100% of the producing cause of Martinez's injuries to the acts and omissions of Goodrich.

The jury awarded the Martinezes $5.5 million in actual damages and $11.5 million in punitive damages. After reducing the award of actual damages by $1.4 million pursuant to a settlement agreement between the Martinezes, Ford, and Budd, reducing the punitive damages to the amount of actual damages pursuant to a pretrial agreement between Goodrich and the Martinezes, and awarding prejudgment interest, the trial court rendered judgment for the Martinezes for $10,308,792.45.

The court of appeals affirmed the award of actual damages, holding that there was legally sufficient evidence to support the finding of a design defect based upon its examination of the following factors: (1) the availability of safer design alternatives; (2) similar acci-

dents involving the same product; (3) subsequent changes or modifications in design; (4) out-of-court experiments indicating Goodrich's knowledge of a design defect; and (5) expert testimony claiming a design defect. 928 S.W.2d at 70. The court rejected Goodrich's argument that Martinez's failure to heed the product's warnings was a complete defense to the product defect claim. However, the court of appeals reversed and rendered the award of punitive damages, holding that there was no evidence to support the jury's finding of gross negligence.

Only Goodrich applied to this Court for writ of error. As in the court of appeals, Goodrich's principal argument here is that no evidence supports the jury finding that the tire was defective because "the tire bore a warning which was unambiguous and conspicuously visible (and not claimed to be inadequate); the tire was safe for use if the warning was followed; and the cause of the accident was mounting and inflating a tire in direct contravention of those warnings."

■ We will sustain a no evidence point of error when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. See Juliette Fowler Homes, Inc. v. Welch Assocs., Inc., 793 S.W.2d 660, 666 n. 9 (Tex.1990) (citing Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 TEX. L.REV. 361, 362–363 (1960)).

## II

### A

■ This Court has adopted the products liability standard set forth in section 402A of the Restatement (Second) of Torts. See Firestone Steel Prods. Co. v. Barajas, 927 S.W.2d 608, 613 (Tex.1996); McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787, 788–89 (Tex.1967). Section 402A states:

**2.** Goodrich has ceased manufacturing bias-ply light truck tires.

(1) one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

RESTATEMENT (SECOND) OF TORTS § 402A (1965). A product may be unreasonably dangerous because of a defect in manufacturing, design, or marketing. *See Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 382 (Tex.1995); *Technical Chem. Co. v. Jacobs*, 480 S.W.2d 602, 604–05 (Tex.1972). To prove a design defect, a claimant must establish, among other things, that the defendant could have provided a safer alternative design. *See Caterpillar*, 911 S.W.2d at 384 ("[I]f there are no safer alternatives, a product is not unreasonably dangerous as a matter of law."). Implicit in this holding is that the safer alternative design must be reasonable, *i.e.*, that it can be implemented without destroying the utility of the product. *See id.* (" 'Texas law does not require a manufacturer to destroy the utility of his product in order to make it safe.' ") (quoting *Hagans v. Oliver Mach. Co.*, 576 F.2d 97, 101 (5th Cir.1978)).[3]

■ The newly released Restatement (Third) of Torts: Products Liability carries forward this focus on reasonable alternative design. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2(b). Section 2(b) provides:

A product ... is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of

the alternative design renders the product not reasonably safe.

To determine whether a reasonable alternative design exists, and if so whether its omission renders the product unreasonably dangerous (or in the words of the new Restatement, not reasonably safe), the finder of fact may weigh various factors bearing on the risk and utility of the product. *See Caterpillar*, 911 S.W.2d at 383–84; *Turner v. General Motors Corp.*, 584 S.W.2d 844, 848 (Tex.1979).[4] One of these factors is whether the product contains suitable warnings and instructions. *See Turner*, 584 S.W.2d at 847. The new Restatement likewise carries forward this approach:

A broad range of factors may be considered in determining whether an alternative design is reasonable and whether its omission renders a product not reasonably safe. The factors include, among others, the magnitude and probability of the foreseeable risks of harm, *the instructions and warnings accompanying the product,* and the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing. ... The relative advantages and disadvantages of the product as designed and as it alternatively could have been designed may also be considered. Thus, the likely effects of the alternative design on production costs; the effects of the alternative design on product longevity, maintenance, repair, and esthetics; and the range of consumer choice among products are factors that may be taken into account. ...

RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. f (emphasis added).

■ Goodrich urges this Court to depart from this standard by following certain language from Comment j of the Restatement (Second) of Torts. Comment j provides in part:

---

3. Although not applicable to the present case, the Texas Legislature has recently codified the "reasonably safe alternative" requirement. TEX. CIV. PRAC. & REM.CODE § 82.005 (safer alternative design must be shown by preponderance of the evidence in design defect case).

4. While there is language in *Turner* suggesting that whether a safer alternative design exists is merely one of the factors to be weighed by the jury, *see* 584 S.W.2d at 846–47, we made clear in *Caterpillar* that a safer alternative is a prerequisite to a finding of design defect, *see* 911 S.W.2d at 384. Our approach in *Caterpillar* is reflected in the new Restatement.

Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

RESTATEMENT (SECOND) OF TORTS § 402A cmt. j (1965). The new Restatement, however, expressly rejects the Comment j approach:

Reasonable designs and instructions or warnings both play important roles in the production and distribution of reasonably safe products. In general, when a safer design can reasonably be implemented and risks can reasonably be designed out of a product, adoption of the safer design is required over a warning that leaves a significant residuum of such risks. For example, instructions and warnings may be ineffective because users of the product may not be adequately reached, may be likely to be inattentive, or may be insufficiently motivated to follow the instructions or heed the warnings. However, when an alternative design to avoid risks cannot reasonably be implemented, adequate instructions and warnings will normally be sufficient to render the product reasonably safe. *Compare* Comment *e. Warnings are not, however, a substitute for the provision of a reasonably safe design.*

RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. *l* (emphasis added). The Reporters' Notes in the new Restatement refer to Comment j as "unfortunate language" that "has elicited heavy criticism from a host of commentators." RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2, Reporters' Note, cmt. *l* (citing Latin, *Good Warnings, Bad Products, and Cognitive Limitations,* 41 U.C.L.A. L.REV. 1193 (1994) (utilizing the work of cognitive theorists to demonstrate that warnings should only be used as a supplement to a design that already embodies reasonable safety and not as a substitute for it); Twerski, *et al., The Use and Abuse of Warnings in Products Liability: Design Defect Comes of Age,* 61 CORNELL L.REV. 495, 506 (1976)). Similarly, this Court has indicated that the fact that a

danger is open and obvious (and thus need not be warned against) does not preclude a finding of product defect when a safer, reasonable alternative design exists. *See Caterpillar,* 911 S.W.2d at 383. ("A number of courts are of the view that obvious risks are not design defects which must be remedied. (citations omitted). However, our Court has held that liability for a design defect may attach even if the defect is apparent.").

The drafters of the new Restatement provide the following illustration for why courts have overwhelmingly rejected Comment j:

Jeremy's foot was severed when caught between the blade and compaction chamber of a garbage truck on which he was working. The injury occurred when he lost his balance while jumping on the back step of the garbage truck as it was moving from one stop to the next. The garbage truck, manufactured by XYZ Motor Co., has a warning in large red letters on both the left and right rear panels that reads "DANGER—DO NOT INSERT ANY OBJECT WHILE COMPACTION CHAMBER IS WORKING—KEEP HANDS AND FEET AWAY." The fact that adequate warning was given does not preclude Jeremy from seeking to establish a design defect under Subsection (b). The possibility that an employee might lose his balance and thus encounter the shear point was a risk that a warning could not eliminate and that might require a safety guard. Whether a design defect can be established is governed by Subsection (b).

RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. *l*, illus. 14.[5] In fact, Goodrich recognized at trial that warnings are an imperfect means to remedy a product defect. In response to a question posed by the Martinezes' attorney, Goodrich engineer Stanley Lew answered:

Q: Is that why designs of a product are more important than warnings on a product because people may not see warnings but they are always going to encounter the design?

A: Yes, that's correct. It's the products they deal with.

5. This illustration is based on *Uloth v. City Tank Corp.,* 376 Mass. 874, 384 N.E.2d 1188 (1978).

For these reasons we refuse to adopt the approach of Comment j of the superseded Restatement (Second) of Torts section 402A.

**B**

■ We do not hold, as the dissenting justices claim, that "a product is defective whenever it could be more safely designed without substantially impairing its utility," *post* at 344, or that "warnings are irrelevant in determining whether a product is reasonably safe." *Post* at 345. Rather, as we have explained, we agree with the new Restatement that warnings and safer alternative designs are factors, among others, for the jury to consider in determining whether the product as designed is reasonably safe. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. f. While the dissenting justices say that they also agree with the Restatement's approach, they would, at least in this case, remove the balancing process from the jury. Instead, they would hold that Goodrich's warning rendered the tape bead design reasonably safe as a matter of law.

■ The dissenting justices first argue that Goodrich's warning was clear and that it could have been followed, and consequently Martinez was injured only by "[i]gnoring ... his own good sense." *Post* at 343. Even if this were true,[6] it is precisely because "it is not at all unusual for a person to fail to follow basic warnings and instructions," *General Motors Corp. v. Saenz*, 873 S.W.2d 353, 358 (Tex.1993), that we have rejected the superseded Comment j. The dissent also notes that there have been few reported mismatch accidents involving tires with this particular warning label. While this is certainly relevant, and perhaps would persuade many juries, we cannot say that it conclusively establishes that the tire is reasonably safe when weighed against the other evidence. The jury heard firsthand how an accident can occur despite the warning label, and how a redesigned tire would have prevented that accident. The jury also heard evidence that Goodrich's competitors had incorporated the single strand programmed bead by the early

1980s, and that Goodrich itself adopted this design in 1991, a year after manufacturing the tire that injured Martinez. Under these circumstances, there is at least some evidence supporting the jury's finding of product defect.

**III**

■ Goodrich argues that even if its Comment j argument does not prevail, it is still entitled to judgment as a matter of law because no safer alternative was available. In response, the Martinezes point to the evidence that Goodrich's competitors, and eventually Goodrich itself, adopted the safer 0.050" single strand programmed bead. Goodrich counters that this alternative design is not in fact safer because if the tire is matched to the wrong size rim the bead will never seat on the rim and it will inevitably explode during use.

We agree with the general proposition that a manufacturer should not be liable for failing to adopt an alternative design that would, under other circumstances, impose an equal or greater risk of harm. To prevail in a design defect case, a plaintiff should be required to show that the safety benefits from its proposed design are foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety. *See* Owen, *Toward a Proper Test for Design Defectiveness: "Micro–Balancing" Costs and Benefits*, 75 TEX. L. REV. 1661, 1690 (1997). As the new Restatement explains:

> When evaluating the reasonableness of a design alternative, the overall safety of the product must be considered. It is not sufficient that the alternative design would have reduced or prevented the harm suffered by the plaintiff if it would also have introduced into the product other dangers of equal or greater magnitude.

RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. f.

The Martinezes, however, offered some evidence that their alternative design not only would have prevented the injury to Martinez, but also that it would not have introduced

---

**6.** As discussed in part V of this opinion, we uphold the jury's finding that Martinez was not negligent.

other dangers of equal or greater magnitude. It is undisputed that the single strand programmed bead is more resistant to breaking in mismatch situations. Goodrich expert Tom Conner testified that in a mismatch situation the tape bead may break at 60 psi, while a single strand bead will not break until at least 130 psi. Conner also testified that he has never heard of a single strand bead breaking during the inflating of a mismatched tire. Goodrich representative Stanley Lew testified that the single strand bead is more resistant in a mismatch situation. Lew also testified that if the tire inflated by Martinez had a single strand bead it would not have exploded. Both Conner and Lew testified that they would prefer a tire inflated by their loved one to have a single strand bead.

It is true that Goodrich also offered some evidence that the single strand programmed bead would have introduced other dangers of equal or greater magnitude because of the risk of "in service" blow-outs. Lew testified that even if a 16" tire was successfully mounted on a 16.5" rim, the tire will fail when used on the road. Conner, a forensic scientist, also stated that both laboratory and road testing revealed that if a 16" tire was mounted on a 16.5" rim the tire will blow out when driven on the road. However, Conner testified that in his 25 years of experience in the tire industry he has never heard of a "single person in the world" that has been hurt by a 16" tire on a 16.5" rim "out in service." Lew testified on direct examination:

Q: Have you personally seen any examples of where the Goodyear programmed single strand bead used in some but not all of its tires failed in service on the wrong sized wheel?

A: No; I haven't seen any.

Lew further testified:

Q: Tell me one person's name from any tire you have ever seen where it's failed in service when a 16's mounted on a 16.5.

A: Fine and I told you at my deposition that no; I don't know a single name.

Q: All right. Tell me one single name of a persons [sic] that's been injured in a mismatch explosion of a single strand bead?

A: Again, I don't know of any.

This evidence does not conclusively prove that the programmed bead would have introduced into the product other dangers of equal or greater magnitude. There was thus a fact issue regarding whether a reasonable alternative design existed, which the jury resolved in favor of the Martinezes.

## IV

■ Goodrich next asserts that the evidence conclusively establishes that the tire rim designed by Ford Motor Company and manufactured by the Budd Company was defective and that such defect contributed to Martinez's injuries, so that the court of appeals erred in affirming the trial court's judgment based on the jury's answers that the rim was not defective and did not contribute to the injury. Goodrich points to Milner's undisputed testimony that the rim was defective because it could have been redesigned to prevent a 16" tire from passing over its flange.

■ The general rule is that opinion testimony, even when uncontroverted, does not bind the jury unless the subject matter is one for experts alone:

[T]he judgments and inferences of experts or skilled witnesses, even when uncontroverted, are not conclusive on the jury or trier of fact, unless the subject is one for experts or skilled witnesses alone, where the jury or court cannot properly be assumed to have or be able to form correct opinions of their own based upon evidence as a whole and aided by their own experience and knowledge of the subject of inquiry.

*McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986) (citing *Coxson v. Atlanta Life Ins. Co.,* 142 Tex. 544, 179 S.W.2d 943, 945 (1944)). *See also* TEX.R. CIV. P. 166a(c) (uncontroverted expert testimony may establish right to summary judgment only "as to subject matter concerning which the trier of fact must be guided by the opinion testimony of experts"). Goodrich argues that this subject

matter is for experts alone because the jury could not have determined, without the benefit of expert testimony, that a safer, feasible, alternative design existed.

We agree that expert testimony was probably necessary to show the feasibility of the alternative rim design which would have prevented a mismatched tire from passing over the rim flange. Once a feasible alternative design was shown, however, the question remained whether the rim as designed was unreasonably dangerous. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2(b) (product is defective in design when risks could have been reduced by adoption of reasonable alternative design *and* omission of the alternative design renders the product not reasonably safe). We conclude that the jury could properly determine whether the rim as designed was unreasonably dangerous, and that it was not required to follow expert testimony on this issue. Milner's expert testimony thus does not conclusively establish that the rim was defective. *Cf. McGalliard,* 722 S.W.2d at 697 (house repairs); *Broussard v. Moon,* 431 S.W.2d 534, 537 (Tex.1968) (dishwasher repairs); *Coxson,* 179 S.W.2d at 945 (sound health of insured at time policy was issued).

██ The dissent argues that, even if the jury was not required to accept the *expert* testimony of rim defect, it was required to accept the lay opinion of Martinez and Martinez's co-worker on this issue. Of course, the fact that the dissent places such weight on this lay testimony supports our conclusion that the subject matter is not solely for experts. Moreover, where the subject matter is not solely for experts, uncontroverted opinion testimony is not conclusive, regardless of whether it comes from an expert or a lay witness. The rule of *McGalliard* quoted above—that expert testimony is generally not conclusive—follows not because the testimony is from an expert, but because it is *opinion* testimony. Unless the subject matter is solely for experts, jurors are capable of forming their own opinions from the record as a whole. *See Coxson,* 179 S.W.2d at 945 (expert testimony is conclusive only where jurors "cannot properly be assumed to have, or be able to form, correct opinions of their

own based upon the evidence as a whole and aided by their own experience and knowledge of the subject of inquiry"). Thus, the jury was entitled to reject the opinion testimony that the rim was defective, regardless of whether it was from an expert, Martinez, or Martinez's co-worker.

██ The dissent also argues that, even without any opinion testimony, the record conclusively establishes that the rim was defective. Milner testified that the rim could have been redesigned to prevent a 16" tire from being mounted on it, possibly by filling the wheel well so that it was not as deep. However, while this is some evidence of a feasible alternative design, it is not conclusive evidence of an unreasonably dangerous product, given the factors that a jury must balance under the Restatement. See RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. f. For example, there was no evidence of whether the alternative design would affect production costs, the rim's road characteristics, or the relative ease of mounting and dismounting the *correct* size tire.

The dissent also argues that the rim is defective as a matter of law because its size was not prominently marked on it. Milner and Conner both testified that the rim's size should be displayed close to the valve stem to reduce the risk of an accidental mismatch. Milner further testified that the size should also be displayed in the wheel well, as some other manufacturers had done. Milner pointed out, however, that "this wheel's probably been cleaned since [the accident] so that the existence of [a size marking] wouldn't necessarily mean that [Martinez] would see it." Indeed, Martinez's co-worker testified that at the time of the accident the wheel was so covered with caliche that "it looked white." Based on this evidence, the jury could have concluded that a size marking near the valve stem would have been obscured, and would not have been seen by Martinez. Similarly, the jury was entitled to conclude that Martinez would not have seen a size marking or warning in the well of the wheel while he was in the process of mounting a tire on the wheel. Thus, even if the dissent were correct that the rim was defective as a matter of law because its size was not clearly marked,

the evidence does not conclusively establish that any such defect was a producing cause of Martinez's injury. Because the issues of rim defect and producing causation were both submitted to the jury in one broad-form question, the jury's negative answer to that question is not contrary to the conclusive evidence.

**V**

Goodrich also argues that the evidence conclusively establishes that Martinez was negligent and that he contributed to his own injuries. Specifically, Goodrich argues that unless some defect in the warning hinders a plaintiff's ability to see and heed it, the failure to see and heed a warning is conclusive proof of contributory negligence.

In reviewing a conclusive evidence point, we must determine whether the proffered evidence as a whole rises to a level that reasonable people could not differ in their conclusions. *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994); Powers & Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX. L.REV. 515, 523 (1991) ("Ultimately, the test for 'conclusive evidence' . . . is similar to the test for 'no evidence' . . .; the court asks whether reasonable minds could differ about the fact determination to be made by the jury."). The jury was asked to decide whether Martinez was negligent, that is, whether he failed to exercise ordinary prudence. Both Martinez and his co-worker Ramundo Regalado testified that, because they had removed 16" tires from the rims on which they were working, they assumed that the rims were also 16". Also, although there was a tire-changing machine on the premises, the evidence was conflicting as to whether Martinez could have used it to secure the tire. Rene Vera, Martinez and Regalado's employer, testified that the tire-changing machine, although inoperable for dismounting tires, could have nonetheless been used to secure the tire during inflation. Regalado testified, however, that the tire-changing machine did not work, despite his repeated requests to the safety foreman to have it repaired, and that had it worked he and Martinez would have been using it on the day of the accident

to secure the tire. Thus, Goodrich failed to conclusively prove that Martinez was negligent in failing to use the machine. There is no evidence that the other safety devices referenced in the tire warning—a safety cage or an extension hose—were available to Martinez. Further, Goodrich offered no evidence as to whether it was practical or feasible under the circumstances for Martinez to bolt the rim to a vehicle axle in order to inflate the tire and seat the bead. Both Martinez and Regalado testified that the manner in which Martinez was inflating the tire was customary in their shop. Based upon this evidence, we cannot conclude that reasonable people could not differ about whether Martinez failed to exercise ordinary prudence under the circumstances.

Because we conclude that Goodrich did not conclusively establish that Martinez was negligent, we do not address Goodrich's argument that there is no evidence to support the jury's allocation of causation.

**VI**

Goodrich next argues that even if it is not entitled to a rendition of judgment, it is entitled to a new trial because of three reversible evidentiary rulings. These rulings were: (1) the admission of evidence of thirty-four other lawsuits against Goodrich involving mismatched tires; (2) the admission of evidence that Goodrich had subsequently redesigned its radial light truck tires to incorporate the single strand programmed bead; and (3) the admission of a "time line" used by the Martinezes' expert. To reverse a judgment based upon erroneously admitted evidence, the complaining party must show that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment or was such that it prevented the complaining party from making a proper presentation of the case to the appellate court. *See Texas Dep't of Human Servs. v. White*, 817 S.W.2d 62, 63 (Tex.1991); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989); TEX.R.APP. P. 61.1.

First, as to the other lawsuits, Goodrich asserts that thirty-three of these thirty-four lawsuits involved tires without pictographic warnings. Therefore, they were not

substantially similar and were admitted without proper predicate. Evidence of earlier accidents that occurred under reasonably similar but not necessarily identical circumstances is admissible. *Missouri–Kansas–Texas R. Co. v. May*, 600 S.W.2d 755, 756 (Tex.1980); *Missouri Pac. R.R. v. Cooper*, 563 S.W.2d 233, 236 (Tex.1978); *see also Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070 (5th Cir.1986) (applying Texas law). Like this case, the earlier accidents resulted from mounting a 16" Goodrich tire with a tape bead on a 16.5" rim. The absence of pictographic warnings on the tires does not render the accidents so dissimilar as to preclude their admission, but merely goes to the weight of the evidence. The trial court did not commit error by admitting evidence of the thirty-four earlier accidents caused by mismatching Goodrich tires.[7]

 Goodrich next complains that the trial court erred by admitting evidence that Goodrich subsequently redesigned its radial light truck tires to incorporate the single strand programmed bead, because radial tires are fundamentally different from the bias-ply tire that injured Martinez, and the bead change was not made in the radial tires for safety reasons. Goodrich first argues that, under these circumstances, the evidence regarding radial tires violates Texas Rule of Civil Evidence 407(a).

Rule 407(a) states:

Subsequent Remedial Measures. When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent remedial measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent remedial measures when offered for another purpose, such as proving ownership, control or feasibility of precautionary measures, if controverted, or impeachment. *Nothing in this rule shall preclude admissibility in products liability cases based on strict liability.*

TEX.R. CIV. EVID. 407(a) (emphasis added). Goodrich argues that this rule only permits the admission of subsequent remedial measures involving the product at issue, and that such measures must have been made for safety reasons. However, the rule does not contain these limitations. Rather, under the express language emphasized above, Rule 407(a) simply does not apply in products liability cases based on strict liability. Thus, the trial court did not violate Rule 407(a).[8]

 Goodrich further argues that, because of the differences between radial tires and bias-ply tires, the evidence regarding the redesign of its radial tires is not relevant to the issue of design defect in its bias-ply tires. Goodrich appears to argue that it was harmed by this evidence because the jury could have improperly inferred that, because Goodrich incorporated the single strand programmed bead into its radial tires, such redesign was feasible and necessary for the bias-ply tire involved in this accident. However, there was independent evidence that the single strand programmed bead *was* feasible for bias-ply tires as early as 1982, when General Tire adopted that design, and that the programmed bead was safer. Under these circumstances, the trial court did not commit reversible error by admitting

7. We disagree with the dissenting justices that the trial court admitted evidence of these accidents "with no more predicate than counsel's argument that the claims are similar to the case in which they were offered." *Post* at 353. At the pretrial hearing on this issue, the Martinezes' counsel informed the court that Goodrich had identified these accidents in response to an interrogatory asking, "How many people do you acknowledge have been injured as a result of mounting or attempting to mount 16 inch diameter tires manufactured by you on a 16.5 inch diameter rim?" While the interrogatory itself may not be in our record, the Martinezes' counsel read it into the record at the pretrial hearing, and no one disputes its wording or that Goodrich identified the thirty-four accidents in response to it. Thus, the Martinezes established that each of the other accidents involved an injury resulting from mounting a 16" Goodrich tire on a 16.5" rim. Further, it was undisputed that each of the other accidents involved a tape bead like that involved in this accident. Under these circumstances, there was an adequate predicate on which to admit the other accidents.

8. We thus need not address the court of appeals' conclusion that Goodrich failed to properly preserve this complaint. *See* 928 S.W.2d at 74.

evidence of Goodrich's redesign of its radial tires.

Raising similar arguments, Goodrich also contends that the trial court erred by admitting evidence of Goodrich's redesign of its "space saver" spare tires. For the reasons discussed above regarding the radial tires, the trial court did not commit reversible error by admitting this evidence.

Goodrich's final evidentiary complaint is that the trial court committed reversible error by admitting a "time line" chart prepared by the Martinezes' expert and used by him during trial. Specifically, Goodrich complains that the time line contained a self-serving compilation of hearsay evidence both irrelevant to the issues in this lawsuit and unfairly prejudicial to Goodrich.

■■■ Charts and diagrams that summarize, or perhaps emphasize, testimony are admissible if the underlying information has been admitted into evidence, or is subsequently admitted into evidence. *See Speier v. Webster College,* 616 S.W.2d 617, 618–19 (Tex.1981); *Cooper Petroleum Co. v. LaGloria Oil & Gas Co.,* 436 S.W.2d 889, 891 (Tex.1969); *Champlin Oil & Ref. Co. v. Chastain,* 403 S.W.2d 376, 389 (Tex.1965). In this case, Goodrich complains that the chart contained highly prejudicial hearsay evidence such as one line reading "numerous 16/16.5 mismatch explosions resulting in serious injury or death." However, all the evidence contained on the chart was already in evidence, principally through Milner's testimony, and Goodrich did not object to its introduction. The trial court did not err by admitting the time line.

### VII

■■ Finally, Goodrich complains that the trial court committed reversible error by not bifurcating the liability and punitive damages phases of the trial as required by this Court's subsequent decision in *Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10 (Tex. 1994). The Martinezes argue that consideration of this point is unnecessary because the court of appeals reversed and rendered the jury's punitive damage award, holding there was no evidence to support the verdict on those damages. However, in *Moriel* we instructed trial courts to bifurcate the liability and punitive damages phases of the trial because certain evidence admissible solely for the purpose of proving punitive damages "has a very real potential for prejudicing the jury's determination of other disputed issues in a tort case." *Id.* at 30. Thus, we must determine whether the trial court erred in refusing to bifurcate the punitive damages phase of the trial, and if so, whether the error was harmful.

In *Moriel* we held that "a trial court, if presented with a timely motion, should bifurcate the determination of the amount of punitive damages from the remaining issues." *Id.* at 30. We stated further that bifurcation applies "to all punitive damages cases tried in the future." *Id.* at 26. Shortly thereafter, in *Ellis County State Bank v. Keever,* 888 S.W.2d 790 (Tex.1994), we applied *Moriel* retroactively. In *Keever,* we stated that "[a]lthough *Moriel* was decided after the court of appeals' decision in this case, its holding should be applied to a pending case in which a party has preserved the complaint that the court of appeals failed to properly scrutinize a punitive damage award." *Id.* at 799. Since Goodrich presented the trial court with a timely motion, the trial court, consistent with our ruling in *Keever,* should have bifurcated the determination of the amount of punitive damages from the remaining issues.

Having determined that the trial court erred in refusing to bifurcate the trial, we must determine whether the trial court's error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *See* Tex.R.App. P. 61.1 The rationale given for bifurcation in *Moriel* was that "evidence of a defendant's net worth, which is generally relevant only to the *amount* of punitive damages, by highlighting the relative wealth of a defendant, has a very real potential for prejudicing the jury's determination of other disputed issues in a tort case." *Moriel,* 879 S.W.2d at 30. Here, the jury was not presented with any evidence of Goodrich's net worth. While we do not hold that net worth evidence is the only prejudice that may result from trying actual and puni-

tive damage claims together, there is no prejudice in this case requiring a reversal of the judgment. Goodrich argues that the Martinezes were free to indulge in inflammatory argument for a high punitive damage award that would not have been permitted in the liability phase had bifurcation been granted. Specifically, Goodrich argues that it was severely prejudiced by the Martinezes' plea for $500,000 for each of the thirty-four other lawsuits filed against Goodrich so as to send a "message back to Akron." Because the other suits were properly in evidence on the issue of liability, however, we conclude that this jury argument was not so prejudicial to the actual damages claim as to require a reversal.

\* \* \*

Because we conclude that there is some evidence to support the judgment of the court below on the theory of products liability, we need not consider Goodrich's claim that there is no evidence as to negligence. For the foregoing reasons, we affirm the judgment of the court of appeals.

HECHT, J., files a dissenting opinion, in which ENOCH and BAKER, JJ., join, and in which OWEN, J., joins in all but Part II.

HECHT, Justice, joined by ENOCH and BAKER, Justices, and by OWEN, Justice, in all but Part II, dissenting.

The Court's revision of its opinion on rehearing requires a responsive revision in this dissent. The dissenting opinion issued July 3, 1998 is accordingly withdrawn, and this opinion substituted.

Having changed about a thousand tires in his life, Roberto Martinez admits he knew better than to lean over a tire while inflating it. Besides, he had seen the pictographic warning on the very tire he was changing which showed a worker being hurt by an exploding tire and warned: "NEVER stand, lean or reach over the assembly during inflation." Ignoring this warning and his own good sense, Martinez was leaning over the tire, inflating it, when it exploded in his face.

The 16" tire exploded because it would not fit the 16.5" wheel on which Martinez was trying to mount it. Martinez knew it was very dangerous to try to mount a 16" tire on a 16.5" wheel, and he would never knowingly have tried to do it, but the size of the wheel was not marked where he could find it. He understood that his co-worker had taken a 16" tire off the wheel, and he was simply trying to put the same size tire back on. The Budd Company, which manufactured the wheel to Ford Motor Company's specifications, knew, as did Ford, that people sometimes try to mount 16" tires on 16.5" wheels, not realizing that tire and wheel are mismatched. To minimize the risk of such mistakes, Budd and Ford could have changed the design of the wheel to prevent mounting mismatched tires, but they did not do so. Budd could also have simply stamped the size in plain view on the outboard side of the wheel near the valve stem where it was almost sure to be seen, but it did not do that, either. Instead it encoded the size in small letters on the inboard side, where it was hard to find if the wheel was clean, and indecipherable if the wheel was dirty, as it was in this case.

Although a 16.5" wheel can be designed so that a 16" tire cannot be mounted on it, a 16" tire cannot be designed so that it cannot be mounted on a 16.5" wheel. A tire manufacturer's only options to reduce the risk of injury from attempting to mount a 16" tire on a 16.5" wheel are to place a warning on the tire or to design the bead wire so that it will withstand higher inflation pressure before exploding. The Uniroyal Goodrich Tire Company, which made the tire Martinez was using, chose to put a prominent, pictographic label on it, which, as I have said, Martinez actually saw but did not heed. Had he done so, he would not have been injured. In fact, according to the record, only one other person has ever claimed to have been injured attempting to mount a 16" tire with a warning label like Goodrich's on a 16.5" wheel, although thousands of labeled tires and more than thirty million 16.5" wheels have been manufactured in the past two decades.

Now as among Martinez, the wheel manufacturers, and Goodrich, how should respon-

sibility for Martinez's accident be apportioned? The reader may be surprised at the answer in this case. Martinez, though negligent by his own admission, is held to bear no responsibility for the accident. The wheel manufacturers, too, are held to be free of responsibility (they settled with Martinez before trial) although the undisputed testimony by both Martinez's and Goodrich's experts is that Budd and Ford defectively designed the wheel. Only Goodrich is held liable—and for providing a warning on the tire that would have prevented Martinez's accident altogether instead of redesigning the bead wire so that the accident would only have been less likely. This aberrant result flows from four serious flaws in the Court's opinion which, even more importantly, misstate the law that will be applied in other cases.

First, the Court holds that a product can be found to be defective whenever it could be more safely designed without substantially impairing its utility. This is not, and should not be, the law. As the *Restatement (Third) of Torts: Products Liability* advises, a "broad range of factors" besides the utility of a reasonable alternate design should be considered in determining whether its use is necessary to keep the product reasonably safe, including "the magnitude and probability of the foreseeable risks of harm [and] the instructions and warnings accompanying the product".[1] When the undisputed evidence is that the magnitude and probability of a risk are low, an alternative design could reduce but not eliminate that risk, and the instructions and warnings given do eliminate the risk, the product should be determined not to be defective as a matter of law.

Second, the Court holds that whether a wheel is defectively designed "because its size is not clearly marked or because its design allows a mismatched tire to be placed on it" can be decided by "lay jurors, based on their own experience and common sense,"

unaided by expert opinion.[2] It follows that a plaintiff, by offering no evidence other than his own lay opinion, could prove that a wheel was defectively designed—that is, that risks of harm were foreseeable, that there was a reasonable alternative design that would reduce and avoid them, and that the omission of the design rendered the product not reasonably safe. I doubt whether such lay testimony would support a judgment in any design defect case.[3] The record in this case proves that such evidence could not possibly support a judgment for Martinez.

Third, the Court holds that evidence of thirty-four other claims of injury over fifteen years from trying to mount 16" Goodrich tires on 16.5" wheels was admissible without proof that any of the claims were valid— some were undisputedly invalid—or that they arose out of accidents similar to Martinez's. A few weeks ago the Court held that evidence of anticipated or unpaid punitive damage claims is irrelevant and inadmissible to show punitive damage liability.[4] Today the Court holds that evidence of other claims— whether proven or not, and whether similar or not—is relevant and admissible to show liability. The Court also holds that an expert may testify that a product has caused serious injury and death when no basis at all has been shown for the statement.

Fourth, the Court holds that the district court's refusal to bifurcate the punitive damages part of the trial was harmless error because Martinez did not offer evidence of Goodrich's net worth. But while net worth evidence can unfairly prejudice the jury's consideration of liability issues, it is not the sole source of prejudice. Today's opinion undermines the bifurcation requirement of *Transportation Insurance Co. v. Moriel.*[5]

Because I disagree with all these holdings, for reasons I now explain in more detail, I respectfully dissent.

**1.** RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2, cmt. f, at 23 (1998).

**2.** *Ante* at 334.

**3.** *See Watkins v. Telsmith, Inc.,* 121 F.3d 984, 991 (5th Cir.1997) (suggesting that expert testimony would be required in design defect cases).

**4.** *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 41 (Tex.1998).

**5.** 879 S.W.2d 10 (Tex.1994).

## I

Comment j to Section 402A of the *Restatement (Second) of Torts* states:

> Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.[6]

We have followed the first clause of comment j, but only to the extent of holding that a plaintiff is entitled to a rebuttable presumption that had he been adequately warned of the dangers of a product, he would have avoided injury, despite the fact that experience teaches that "it is not at all unusual for a person to fail to follow basic warnings and instructions."[7] The presumption is merely a procedural device to obviate the necessity of plaintiff's self-serving testimony that he would have heeded adequate warnings.[8] In making the presumption rebuttable we recognized that the first clause is not always true. Further, we have never followed the second clause of comment j, and now the *Restatement (Third) of Torts: Products Liability* has withdrawn comment j altogether as "unfortunate language" that "has elicited heavy criticism from a host of commentators."[9] The Court's firm rejection of comment j, which the Court has never adopted and the *Restatement* has now itself rejected, is perhaps beating a dead horse, but I agree that comment j does not correctly state what the law is or should be.

Since it is human nature to disregard instructions, a rule that any product is reasonably safe as long as it bears an adequate warning of the risks of its use is not feasible. Such behavior, however, does not warrant the opposite rule that warnings are irrelevant in determining whether a product is reasonably safe. I agree with the Court that comment l to Section 2 of the *Restatement*

*(Third) of Torts: Products Liability* now has it about right:

> Reasonable designs and instructions or warnings both play important roles in the production and distribution of reasonably safe products. In general, when a safer design can reasonably be implemented and risks can reasonably be designed out of a product, adoption of the safer design is required over a warning that leaves a significant residuum of such risks. For example, instructions and warnings may be ineffective because users of the product may not be adequately reached, may be likely to be inattentive, or may be insufficiently motivated to follow the instructions or heed the warnings. However, when an alternative design to avoid risks cannot reasonably be implemented, adequate instructions and warnings will normally be sufficient to render the product reasonably safe. Warnings are not, however, a substitute for the provision of a reasonably safe design.[10]

I do not agree, however, that the Court correctly reads or follows comment l. Comment l limits but does not foreclose the role of warnings in making products reasonably safe, even when there is a safer alternative design. The Court stresses the last sentence of comment l and brushes past the first sentence. Taken as a whole, the comment says, correctly, I think, that a safer alternative design that eliminates a risk is required over a warning that leaves a significant residuum of risk because product users may not get the warning, may be inattentive, or may not be motivated to heed the warning. The illustration accompanying comment l is of a worker whose foot is severed by a garbage truck's blade and compaction chamber when he loses his balance jumping onto the back of the truck.[11] A warning on the truck, "keep hands and feet away", does little to protect

---

6. RESTATEMENT (SECOND) OF TORTS § 402A, cmt. j, at 353 (1965).

7. *General Motors Corp. v. Saenz*, 873 S.W.2d 353, 358 (Tex.1993); *see Magro v. Ragsdale Bros., Inc.*, 721 S.W.2d 832, 834 (Tex.1986); *Technical Chem. Co. v. Jacobs*, 480 S.W.2d 602, 606 (Tex. 1972).

8. *Saenz*, 873 S.W.2d at 359.

9. RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2, Reporters' Note, cmt. l, at 101 (1998).

10. RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2, cmt. l, at 33 (1998) (citation omitted).

11. *Id.*, illus. 14, at 33.

against a worker's foreseeable inadvertence or misstep in the usual discharge of his job. But the warning might well be adequate admonishment to the merely curious, even if the garbage truck could be designed to be safer, if the residuum of risk were insignificant. Even if the risk that a worker will lose his balance and slip is significant enough to warrant designing additional protections in the truck, the risk that someone will intentionally stick his hand in a place where it obviously may be hurt when he is effectively warned not to do so may not warrant design changes.

Section 2(b) of the *Restatement (Third) of Torts: Products Liability* states the applicable rule:

> A product ... is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, *and* the omission of the alternative design renders the product not reasonably safe.[12]

There are two components to this rule: the possibility of a safer, reasonable alternative design, *and* a product that is not reasonably safe without that design. Both are required. Even if a reasonable alternative design would make a product safer, the product is not defective unless the omission of the design makes the product not reasonably safe. The comparison is not between the two designs, but between the product alternatively designed and the product including any warning. Comment f to Section 2 explains:

> Subsection (b) states that a product is defective in design if the omission of a reasonable alternative design renders the product not reasonably safe. A broad range of factors may be considered in determining whether an alternative design is reasonable and whether its omission renders a product not reasonably safe. The factors include, among others, the magnitude and probability of the foreseeable risks of harm, the instructions and warn-

ings accompanying the product, and the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing. The relative advantages and disadvantages of the product as designed and as it alternatively could have been designed may also be considered.[13]

The Reporters' Note gives an example of how factors other than a safer alternative design affect the determination whether a product is defective:

> Comment *f* lists among the factors a court may consider in determining whether an alternative design is reasonable and whether its omission renders a product not reasonably safe the following: (1) magnitude and probability of the foreseeable risks of harm; (2) the instructions and warnings accompanying the product; and (3) the nature and strength of consumer expectations. A recent California case is in agreement. In *Hansen v. Sunnyside Products, Inc.*, 55 Cal.App.4th 1497, 65 Cal.Rptr.2d 266 (1997), the court held that in a claim alleging defective design of a household cleaner containing hydrofluoric acid, the availability of an alternative safer design was not dispositive of liability. The fact-finder could consider the warnings on the bottle describing the danger of exposing a user's skin to the cleaner in risk-utility balancing to decide whether the product was unreasonably dangerous.[14]

*Hansen* explained its rationale as follows:

> We do not think that the risk to the consumer of the design of many household products can be rationally evaluated without considering the product's warnings. Thus, for example, what is the risk of the design of a power saw, or other power tools or equipment, without considering the product's directions and warnings? We dare say that the risk would be astronomically, and irrationally, high. The same could be said about common garden pesticides, or even the household microwave oven. In our view, were we to ask

---

12. RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2(b), at 14 (1998) (emphasis added).

13. *Id.* § 2, cmt. f, at 23 (citation omitted).

14. *Id.* § 2, Reporters' Note, cmt. f, at 94.

jurors to evaluate the risks of the design of many household products without considering their directions or warnings, the practical result would be the withdrawal from the market of many useful products that are dangerous in the abstract but safe when used as directed.[15]

Another example the *Hansen* court might have picked is aerosol cans. Such cans are not defective merely because they could be redesigned so as not to explode if punctured or incinerated. A warning against such misuse ought to be sufficient.

The Court protests that it has not disregarded the effect of warnings in determining whether the possibility of a safer alternative design makes a product defective but has merely left the matter to the jury. But the question remains: can any product be shown not to be defective as a matter of law if a reasonable alternative design could have avoided plaintiff's injury? The Court suggests no such possibility. The *Restatement* appears to contemplate that a product is not defective as a matter of law if the safer design does not eliminate the risks, or if the warning on the product does not leave a significant residuum of risk, as when "users of the product may not be adequately reached, may be likely to be inattentive, or may be insufficiently motivated to follow the instructions or heed the warnings."[16] The present case illustrates this rule. Concededly, the evidence favorable to Martinez shows that the Goodrich tire's bead wire can be redesigned, mostly to increase its strength, without significantly reducing the tire's utility or increasing the danger of blowouts at highway speeds. Such an alternative design is thus reasonable and safer. But it only reduces—it does not eliminate—the risk that a tire being mounted on a mismatched wheel will explode. The undisputed evidence in this case is that a 16" tire cannot be mounted on a 16.5" wheel, and that if the tire continues to be inflated in an effort to force it to seat on the wheel rim, it will explode. Redesigning the bead wire only means that the tire will withstand higher inflation pressure before exploding. Although there was evi-

dence that the alternate design would prevent the tire from exploding at ordinary mounting pressures, nothing about the design precludes the person mounting the tire from continuing to increase the pressure in an effort to force it to seat on the rim. Because the risk of explosion cannot be eliminated, omission of the alternative design may not make the tire not reasonably safe under comment l of the *Restatement*.

Nor was Goodrich's warning ineffective, another factor under comment l. Goodrich's warning label showed a picture of a person being injured by an exploding tire and stated in bright colors:

### DANGER

NEVER MOUNT A 16"
SIZE DIAMETER TIRE
ON A 16.5" RIM.

Mounting a 16" tire on a 16.5" rim can cause severe injury or death. While it is possible to pass a 16" diameter tire over the lip or flange of a 16.5" size diameter rim, it cannot position itself against the rim flange. If an attempt is made to seat the bead by inflating the tire, the tire bead will break with explosive force.

· · ·

NEVER inflate a tire which is lying on the floor or other flat surface. Always use a tire mounting machine with a hold-down device or safety cage or bolt to vehicle axle.

NEVER inflate to seat beads without using an extension hose with gauge and clip-on chuck.

NEVER stand, lean or reach over the assembly during inflation.

· · ·

Failure to comply with these safety precautions can cause the bead to break and the assembly to burst with sufficient force to cause serious injury or death.

Martinez does not question the adequacy of the warning. It cautions not only against mismatching tires and wheels but against

---

**15.** *Hansen v. Sunnyside Prods., Inc.*, 55 Cal. App.4th 1497, 65 Cal.Rptr.2d 266, 278 (1997).

**16.** Restatement (Third) of Torts: Products Liability § 2, cmt. *l*, at 33 (1998).

inflating tires in certain ways under *any* circumstances. The record in this case does not show that a warning against mismatching tires and wheels will not reach users. On the contrary, Martinez testified that he saw the warning on the tire, and anyway, he knew that it would be very dangerous to try to mount a 16" tire on a 16.5" wheel. As Martinez put it, "common sense also tells you that where you have a mismatch you can get injured." Martinez was not inattentive, as the garbage truck worker who lost his balance. He knew better than to lean over a tire—any tire—while inflating it. None of the reasons in comment l that warnings may be ineffective apply in this case.

Nor were the warnings impractical. Despite the fact that Martinez was not provided with any of the safety devices prescribed in the warning—a workable tire mounting machine, a cage, or an extension hose with gauge and clip-on chuck—and may not have been able to bolt the wheel back on the trailer from which it had been removed before mounting the tire, he could have avoided injury by simply not leaning over the tire while inflating it. Martinez testified as follows:

> Q Now, I believe you have also testified, Roberto, that while you are inflating a tire you would not want to be leaning over the tire as you inflate it.
>
> A No.
>
> Q And by that I mean when you are airing it up during the mounting process you would want to lean away from it; would you not?
>
> A Well, just don't get over it, you know, just be right beside it.
>
> Q Why would you not want to be leaning over it?
>
> A Because that's the way I was caught.
>
> Q Okay. Do you feel it would be a safety consideration, to be safer to not be over the tire—
>
> A Yes.
>
> Q —while you're inflating it?
>
> A Yes.

The inboard side of the tire, next to the ground, exploded. Martinez was injured when the wheel struck his head. The wheel also struck the roof of the shop overhead and dented it. Clearly, had Martinez not been leaning over the wheel, as he knew not to do and as the tire label warned against, the tire would not have struck his head.

Given the ease with which injury can be avoided, there is no evidence that redesigning the bead wire will eliminate a "significant residuum of risk" in the tire as designed with the warning label. In fact, Martinez's own evidence is to the contrary. The record establishes that there has been only one other claimed injury caused by attempting to mount a 16" tire with a warning label on a 16.5" wheel. The record does not reflect whether that claim was ever proved. Thousands of 16" tires have been manufactured with warning labels; millions of 16.5" wheels have been manufactured without warning labels. Martinez's evidence (which should not have been admitted) shows thirty-four claims against Goodrich for injuries caused by mismatching unlabeled 16" tires on 16.5" wheels. There has been one other claim involving a labeled tire. The tire industry should not be compelled to redesign bead wires to make tires harder to explode—or pay damages for failing to do so—simply because one or perhaps two mechanics over the years failed to follow directions or their own good sense.

> From a fairness perspective, requiring individual users and consumers to bear appropriate responsibility for proper product use prevents careless users and consumers from being subsidized by more careful users and consumers, when the former are paid damages out of funds to which the latter are forced to contribute through higher product prices.[17]

Thus, under comment *l*, there is no evidence that omission of the safer bead wire design made Goodrich's tire not reasonably safe. The risk of explosion could not be eliminated, the warning was clear, effective, and easy to follow, and thus no significant residuum of risk remained in the tire as designed with the warning label attached. In the Court's view, a product manufacturer

---

17. *Id.* § 2, cmt. a, at 16.

may be liable for failing to make any feasible design change that does not significantly impair a product's utility, if only to prevent rare mishaps from conscious disregard of adequate warnings. That is all the evidence in this case shows. The Court appropriately rejects one extreme position—comment j to Section 402A of the *Restatement (Second) of Torts*—but then adopts the opposite and equally extreme position. In so doing, the Court swings toward strict liability.

## II

The evidence is undisputed that the wheel was defectively designed, and that the defect helped cause the accident. Martinez's expert testified:

Q And in your opinion the Budd wheel, Exhibit 2, is defective.

A Yes, sir.

Q And it was a cause of the accident.

A Yes, one of the causes.

Martinez's expert explained that a 16.5" wheel can be designed to prevent mounting a 16" tire, but that the tire cannot be designed to prevent attempts to mount it on the wheel. Moreover, the expert explained that stamping the size on the wheel in plain sight, as some wheel manufacturers do, would reduce the risk of mismatching. Martinez acknowledged that it "makes sense" that the size of the wheel be stamped on the outboard side near the valve stem where it can easily be seen. Martinez's co-worker also testified:

Q If when you were working with this wheel you had seen the number 16.5 you wouldn't have proceeded, would you?

A No, sir.

Q You knew based on your experience that you do not mix different sizes?

A No.

Q That's something every mechanic knows?

A Yes, sir.

Q If the wheel that you were working on had the warning . . . , "To avoid person-

al injury during mounting of tire to wheel mount only 16.5 inch diameter tire," you would not have proceeded because that would have told you that the wheel really was 16.5?

A Yes, sir.

The undisputed evidence is that Budd and Ford did not design their wheel to prevent 16" tires from being mounted on it, and did not stamp the size where it could be seen. Rather, the size was included in a string of numbers stamped on the inboard side of the tire that were hard to find and harder to decipher. The wheel Martinez was working on was so covered by caliche that it would have been virtually impossible to find the tire size.

Goodrich argues that the evidence conclusively establishes that the wheel rim was defectively designed and that the defective design was a cause of Martinez's injuries. The Court rejects this argument, using the rule that "opinion testimony, even when uncontroverted, does not bind the jury unless the subject matter is one for experts alone".[18] The Court concedes that "expert testimony was probably necessary to show the feasibility of the alternative rim design which would have prevented a mismatched tire from passing over the rim flange."[19] Thus, in the Court's view, with which I agree, the evidence establishes one component of defective design—the possibility of a safer, reasonable alternative rim design.[20] The second component—that the rim was not reasonably safe without the alternative design[21]—is not in this context, according to the Court, a matter for experts alone. Thus, the Court concludes, the evidence does not conclusively establish that the wheel rim was defectively designed. But the Court's conclusion does not follow from its premise. That is, even if the jury was free to disregard expert testimony that the wheel rim was unreasonably dangerous as designed, including the testimony on Martinez's own expert, *because the subject was not one for experts alone*, the

18. *Ante* at 338.

19. *Ante* at 339.

20. *See* Restatement (Third) of Torts: Products Liability § 2(b), at 14 (1998).

21. *See id.*

matter may nevertheless be conclusively established by the evidence.

As a general rule, the testimony of a party or a witness who has an interest in the outcome of a suit cannot conclusively establish a matter but raises an issue of credibility on which the jury must pass.[22] But there are exceptions. Even summary judgment can be granted on "uncontroverted testimonial evidence of an interested witness ... if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted."[23] As we explained in *Collora v. Navarro:*

> First, the general rule governing the finality to be given to testimony of an interested witness is by no means an absolute one to be applied in a cut-and-dried fashion. Rather, it is flexible and its application must turn on the facts of each case. Certainly there will be cases where the credibility of an interested witness or party is so suspect that it must go to the jury, even though the testimony is uncontradicted. Then there will also be cases where the testimony of the witness is so clear that the jury should not be allowed to speculate as to his veracity. Between these two extremes lies a broad spectrum of possibilities. Our courts have recognized this in the past by setting forth certain standards by which the rule and its exceptions are to be measured: Is the testimony clear, direct, and positive? Is it internally consistent? Is it contradicted or corroborated by other witnesses? Does the opposing party possess the means to verify or dispute the testimony? Does he have a way to test the witness' credibility? Obviously no one factor automatically can be dispositive in every case.[24]

*Collora* was a suit for partition of real property in which plaintiff claimed an interest as defendant's common law wife. Plaintiff testified that she and the defendant had agreed to be husband and wife—one of the elements of a common law marriage—and the evidence conclusively established the other elements. Defendant did not testify or offer evidence in rebuttal. The trial court directed a verdict for the plaintiff, based on her uncontradicted testimony. The court of civil appeals reversed, holding that the plaintiff's testimony did not conclusively establish the existence of an agreement to be husband and wife because the jury could have chosen not to believe her, and thus reasonable minds could differ over the conclusions to be drawn from her testimony.[25] This Court reversed the court of civil appeals, holding that the directed verdict was proper.

The testimony of Martinez and his co-worker, as well as Martinez's expert witness, that the wheel rim was unreasonably dangerous was contrary to Martinez's interest in the case. It was to Martinez's benefit that the percentage responsibility for causing his injuries assigned to the wheel manufacturers be as low as possible, since he had already settled with them. Testimony that the wheel rim was defectively designed undercut Martinez's position that Goodrich alone was responsible. Because there was nothing to cast suspicion on Martinez's testimony or that of his co-worker and his expert witness concerning whether the wheel rim was unreasonably dangerous as designed, the jury was bound by that testimony. Their testimony, contrary to Martinez's interest, was more like testimony by a disinterested witness. Professors William Powers, Jr. and Jack Ratliff have explained the considerations for determining whether a disinterested witness's testimony is binding on the jury:

> Must the jury accept [the uncontradicted testimony by a disinterested witness]? That is, does such testimony, if uncontradicted, [conclusively establish a fact]? The prevailing and better view is that the reasonable minds test should apply here. If there is nothing to cast suspicion on the testimony—that is, if reasonable minds could not differ—then the jury must accept

---

22. *Collora v. Navarro,* 574 S.W.2d 65, 69 (Tex. 1978).

23. Tex.R. Civ. P. 166a(c).

24. *Id.*

25. *Navarro v. Collora,* 566 S.W.2d 304 (Tex.Civ. App.—Corpus Christi), *rev'd,* 574 S.W.2d 65 (Tex. 1978).

it. But, if the testimony is impeached, inconsistent, or otherwise suspect (even though not directly controverted)—that is, if reasonable minds might or might not accept it—then the jury may reject it. McDonald aptly observes that disinterested testimony is, in fact, treated much the same as interested testimony, except that courts are more inclined in the case of interested testimony to find suspicious circumstances that would allow the jury to reject it.[26]

Even without the testimony of Martinez, his co-worker, and his expert, the record establishes that the wheel rim was defectively designed. As already noted, the factors to be considered in determining whether a product is unreasonably dangerous include the magnitude and probability of the foreseeable risks of harm, the instructions and warnings accompanying the product, the nature and strength of consumer expectations regarding the product, and the relative advantages and disadvantages of the product as designed and as it alternatively could have been designed.[27] Concerning these factors: the risk of injury from mismounting a tire was the same for the defectively designed wheel rim as for the defectively designed tire; the wheel bore no warnings, as the tire did; consumer expectations were no different for the wheel than for the tire; and there was no evidence that the wheel rim design was advantageous or the alternate design disadvantageous. In sum, the evidence established that the tire was less dangerous than the wheel rim, because the tire at least had a warning label and the wheel had none.

The Court states that Martinez's expert's testimony that the wheel was defective was not evidence that it was unreasonably dangerous. But the expert was directed by Martinez's counsel to assume that "defect is defined by the Court as being unreasonably dangerous." The Court states that the expert's opinion was not conclusive, given the factors the jury was to balance. But the only

factors the jury was instructed in the charge to consider were "the utility of the product and the risk involved in its use." Moreover, Martinez's expert testified that the defect in the wheel could have been remedied simply and without difficulty. Specifically, the expert testified as follows:

Q From the moment it came on the market the 16–1/2–inch rim could have been changed so that you couldn't get the wrong sized tire on it.

A I believe it could, yes.

Q The same thing is not true for the 16–inch tire. There is no way to design or alter the 16–inch tire so that somebody by mistake doesn't try to put it on a 16–1/2–inch wheel. That is true; isn't it?

A I don't know of a way to do it, no. I have not seen a way to do that.

Q In your view, if the wheel companies were going to come out with a new 16–1/2–inch size which actually looks somewhat smaller than the 16 they should have designed that new wheel in such a fashion that it looked very different from the old 16; isn't that correct?

A I would certainly recommend that, yes.

Q In your opinion, that could have been done.

A I think it could, yes.

Q That would not have been difficult to do.

A No; I can see where one could do it.

Q And it is further your opinion that once it occurred to the wheel companies that they had done something that was, in fact, causing a substantial problem, they then could have taken what they had and altered its configuration so that you couldn't get the wrong sized tire on it.

A In subsequent productions they could, yes.

Q And that could have been done by something as simple as filling in the well so

**26.** William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence"*, 69 TEX. L.REV. 515, 524 (1991) (citing 3 R. MCDONALD, TEXAS CIVIL PRACTICE § 11.28.6, at 209 (1984)). *See* 4 MCDONALD TEXAS CIVIL PRACTICE § 21.58, at 149–151 (1992).

**27.** RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2(b), cmt. f, at 23 (1998) (emphasis added).

that it wasn't quite so deep; is that a fair statement?

A That's one way to do it. There may be other ways to do it as well, but that's one way to do it.

Q Well, the one way that I just mentioned is one that you have specifically advocated yourself.

A I have done that myself, yes.

Q You not only did it, but you wrote a paper on it.

A Yes, sir.

The Court also states that the jury was free to speculate that marking the wheel size on the wheel itself might not have prevented Martinez's injury because the marking might have been covered by caliche or not seen by Martinez. But Martinez's expert's testified that if the size had been stamped in the drop center or the well of the wheel, it could not have been obscured. Specifically, the expert testified as follows:

Q Well, the language here where it says, quote, use only 16.5 tires, that was stamped on Kelsey–Hayes wheels starting at about 1980.

A Yes.

Q Exactly where you wanted it to be, near the valve hole.

A Well, I think, I think you are quoting me a little out of context. I said it wouldn't be a good idea, it would be a good idea for that to be there. But the best place for it is in the drop center where there is more room for it and where it is not obstructed by dirt and paints.

\* \* \*

Q Okay. Let's be sure that we understand that in plain and simple English. It means, one, that in 1980 General Motors directed its supplier Kelsey–Hayes to stamp something near the valve hole and to place this warning in the well of every wheel it made after that.

A That is right.

Q And Ford never directed Budd to do anything until Budd stopped making the wheel in 1983.

A That's my recollection, yes.

Had the wheel size been stamped or labeled in the drop center or well of the wheel, it could not have been obscured, no matter how dirty the wheel became, and Martinez could not have missed it.

The evidence, including the testimony of Martinez's own expert, conclusively established that the wheel manufacturers bore some responsibility for Martinez's injuries. Since the evidence did not establish the precise percentage of responsibility attributable to the wheel manufacturers, Goodrich is entitled only to a new trial.

### III

Martinez offered, and the district court admitted in evidence, a list of thirty-four lawsuits against Goodrich involving claims for injuries suffered in attempting to mount 16" Goodrich tires on 16.5" wheels. Goodrich complains that Martinez never laid a predicate for admitting this evidence, showing the similarity of the other lawsuits to this one. The Court dismisses Goodrich's complaint in a sentence: "The absence of pictographic warnings on the tires does not render the accidents so dissimilar as to preclude their admission, but merely goes to the weight of the evidence." [28]

The Court has not met the substance of Goodrich's argument. First, Goodrich argues that Martinez laid no predicate whatever for admission of the evidence. Martinez does not, and cannot, dispute this. The district court admitted the list of lawsuits based solely on the statement of Martinez's counsel that the information had been produced by Goodrich in answer to an interrogatory in discovery. The interrogatory and answer were never offered in evidence (and are not in our record), nor was there any other proof to show the nature of the cases listed. A plaintiff who offers evidence of other accidents is "required to show that the earlier accidents occurred under reasonably similar but not necessarily identical circumstances." [29] Martinez made no showing

**28.** *Ante* at 341.

**29.** *Missouri Pac. R.R. Co. v. Cooper,* 563 S.W.2d

233, 236 (Tex.1978) (citing *Karr v. Panhandle &*

whatever. Thus, the Court holds that evidence of other claims may be admitted with no more predicate than counsel's argument that the claims are similar to the case in which they are offered. This, of course, eviscerates any meaningful evidentiary standard.

Second, although Goodrich argued that the presence or absence of pictographic labels was a significant difference in claims of injury due to mismatch tires, that was not the only difference Goodrich claimed was significant. Other differences in the cases, according to Goodrich's counsel, were how experienced the injured person was in changing tires, what safety equipment was available, what kind of tire was involved and whether it was radial or bias ply, and what the result was in the case. At least two of the cases were dismissed against Goodrich. The burden was not on Goodrich to show that the other cases were different; the burden was on Martinez to show that they were similar.[30] Nevertheless, Goodrich pointed out important differences to the court.

Third, the presence of pictographic labels may have been a significant distinction in the cases. Of the thirty-four on the list Martinez offered, only two involved pictographic labels. It may be that fewer accidents involved labeled tires because the labels were effective, or because fewer tires were manufactured with labels, or because labels had been used for only a short time, or perhaps for other reasons. Such arguments would go merely to the weight to be given the evidence, not its admissibility. But without any predicate at all offered by Martinez, it is impossible to say that the presence of the label was not significant.

Finally, admission of the list was extremely prejudicial to Goodrich. Martinez's counsel told the court before trial that "[i]n all these cases we keep talking about . . . they keep killing and injuring people". Martinez's counsel asked his own expert witness: "And some tire companies it only takes twenty-nine or thirty people to get killed or injured

before they come to the conclusion that maybe they ought to change their bead." Martinez's counsel asked Goodrich's expert: "So how many people have you all killed?" Without any predicate whatever, Martinez's counsel was permitted to use the list of lawsuits to insinuate repeatedly that others had been injured or killed in circumstances similar to those in this case. This was plainly error.

The lawsuit list was not the only exhibit erroneously admitted. The district court also admitted a chart sponsored by Martinez's expert witness showing the history of changes in bead wire design. The Court's conclusion that "all the evidence contained on the chart was already in evidence"[31] is simply false. There is absolutely no evidence of the very prejudicial reference on this timeline to "numerous 16/16.5 mismatch explosions resulting in serious injury or death." It should go without saying that a party should not be permitted to assert repeatedly that an opponent's product has killed and injured people without proof that it is actually so.

Only a few weeks ago the Court held in *Owens–Corning Fiberglas Corp. v. Malone* that evidence of anticipated or unpaid punitive damage claims is irrelevant and therefore inadmissible to show punitive damage liability.[32] If anticipated or unpaid punitive damage claims are not probative of punitive damage liability absent evidence of whether such claims have succeeded, I fail to see how actual damage claims are probative of liability for actual damages absent the same evidence. Today's holding that evidence of other claims—whether proven or not, and whether similar or not—is relevant and admissible to show liability directly conflicts with our decision in *Owens–Corning* and essentially destroys any standard for admitting evidence of other claims.

### IV

The Court holds that the district court erred in denying Goodrich's motion to bifur-

---

*Santa Fe Ry. Co.* 153 Tex. 25, 262 S.W.2d 925, 928, 932 (1953), and *Dallas Ry. & Terminal Co. v. Farnsworth,* 148 Tex. 584, 227 S.W.2d 1017, 1020 (1950)).

**30.** *Id.*

**31.** *Ante* at 342.

**32.** 972 S.W.2d 35, 41 (Tex.1998).

cate the actual and punitive damages phases of the trial, but that the error was harmless because Martinez offered no evidence of Goodrich's net worth and the evidence of other lawsuits against Goodrich was properly admitted. I have already shown that the list of lawsuits should not have been admitted without a predicate showing of similarity between each of the lawsuits and this case. But even if the list of other lawsuits was properly admitted, it alone required a bifurcation of the actual and punitive damage claims.

As the Court notes, "[i]n [*Transportation Insurance Co. v.*] *Moriel* we held that 'a trial court, if presented with a timely motion, should bifurcate the determination of the amount of punitive damages from the remaining issues." [33] Although we reasoned in *Moriel* that evidence of a defendant's net worth offered on a punitive damage claim could unfairly prejudice a defendant on plaintiff's claim for actual damages, we did not suggest that net worth evidence was the only prejudice in trying actual and punitive damage claims together. In the present case, Martinez's counsel's repeated references to other claims against Goodrich were plainly intended to insinuate that if others had been injured trying to mount Goodrich's 16" tires on 16.5" wheels, the tire was defective, and the defect caused Martinez's injuries. The list of other lawsuits, even if properly admitted, unfairly prejudiced Goodrich on Martinez's liability claim as much as evidence of its net worth would have.

The district court refused Goodrich's motion to bifurcate the trial before evidence was offered and without regard to whether Martinez would offer evidence of net worth. The record shows that the district court refused to follow *Moriel* because Martinez did not want a bifurcated trial. The court's error clearly prejudiced Goodrich.

＊　＊　＊　＊　＊

The record in this case shows that Goodrich's tire including the warning label was not defectively designed as a matter of law. Even if that were not so, Goodrich is entitled to have its liability determined in a fair trial in which at least some responsibility for the accident is assigned to Martinez and the wheel manufacturers, evidence of other claims against Goodrich is excluded until a proper predicate is laid for its admission, and punitive damages are tried separately as required by *Moriel*. Because the Court denies Goodrich any relief, I respectfully dissent.

---

33. *Ante* at 342 (quoting *Transportation Ins. Co. v.* *Moriel,* 879 S.W.2d 10, 30 (Tex.1994)).