In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00122-CV


______________________________




CHARLES T. MERRELL, SR., AS WRONGFUL DEATH


BENEFICIARY OF CHARLES THOMAS MERRELL, II,

DECEASED AND AS REPRESENTATIVE OF THE ESTATE

OF CHARLES THOMAS MERRELL, II, DECEASED, AND

JANE CERVERNY, AS WRONGFUL DEATH BENEFICIARY

OF CHARLES THOMAS MERRELL, II, DECEASED, Appellants


V.



WAL-MART STORES, INC., Appellee




 


On Appeal from the 336th Judicial District Court


Fannin County, Texas


Trial Court No. 38243




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Carter



O P I N I O N



 Charles T. Merrell, Sr., and Jane Cerverny (1) (collectively the Parents) bring this appeal of the
trial court's order granting Wal-Mart, Inc., summary judgment. (2) This is a products liability suit based
on an allegedly defective halogen torchiere lamp which may have caused the wrongful death of
Charles Thomas Merrell, II (Charles II), Merrell and Cerverny's son. Charles II had just graduated
from Austin College and had been hired as a stockbroker for A.G. Edwards' Paris, Texas, office. The
house Charles II rented caught fire and burned, killing Charles II and his girlfriend, Latosha Gibson. 
The fire originated near the recliner in the living room. The fire report indicated the cause of the fire
was unknown. The halogen torchiere lamp, which the Parents allege was the cause of the fire, was
located next to the recliner. Wal-Mart denied the lamp was the cause of the fire. An alternative
cause of the fire, which Wal-Mart alleges was more likely the cause, was that a dropped marihuana
joint or cigarette caused the fire. Both victims had marihuana in their systems at the time of their
deaths. The trial court granted Wal-Mart's no-evidence and traditional motions for summary
judgment. 

 The Parents complain on appeal that the trial court erred in granting Wal-Mart's summary
judgment motion. Wal-Mart raises a counter-issue alleging the trial court erred in admitting some
of the summary judgment evidence. We conclude the trial court did not abuse its discretion in
admitting the summary judgment evidence. The trial court, though, did err in granting Wal-Mart's
motion for summary judgment. The Parents presented more than a scintilla of evidence concerning
each element challenged by Wal-Mart, and Wal-Mart did not establish it was entitled to judgment
as a matter of law. We reverse the judgment of the trial court.

Facts

 When Charles II graduated with honors from Austin College, he accepted a position as a
stockbroker with A.G. Edwards in Paris, Texas. Charles II and Gibson rented a home in Honey
Grove, Texas, near Paris, Texas. In October 2000, Charles II began a nine-week course to prepare
for the stockbroker's examination and asked Merrell to "go and buy a floor lamp so he could study
because the lighting was so bad in that house." The two went together to purchase the lamp at Wal-Mart. Although Merrell could not remember the specific Wal-Mart store at which the lamp was
purchased, Merrell testified he was positive the lamp was purchased at a Wal-Mart store because he
"never shopped anywhere but Wal-Mart." Charles II selected a lamp which may have been a halogen
torchiere lamp. (3) Merrell paid around $30.00 for the lamp. Because the lamp was a floor model,
Merrell did not receive a box, any of the accompanying warnings, or instructions for safe operation. 
Even though the United States Consumer Product Safety Commission (the Commission) required
all retailers to make available a free wire mesh guard for all halogen torchiere lamps, Wal-Mart did
not provide a wire mesh guard with the lamp. Merrell testified there was a warning sticker on the
cord, but could not remember what the sticker said. Charles II took the lamp home and placed it by
his recliner in the living room. 

 During the early morning hours of December 2, 2000, a fire started in the living room while
Charles II and Gibson were sleeping. The fire engulfed the entire house. Neither Charles II nor
Gibson were able to escape, and both died of smoke inhalation. The toxicology report detected
cannabinoids in the blood of both victims at the time of their deaths. It is uncontested that the fire
originated in the general vicinity of the recliner. The recliner was completely consumed in the fire
and was more extensively consumed by the fire than any other piece of furniture. The fire burned
through the ceiling approximately two feet from the recliner. 

 The fire inspectors concluded the "exact cause of the fire could not be determined." 
Although photographs of the fire were preserved, the lamp was inadvertently disposed of and has
not been recovered. (4) In the fire report, the fire inspectors noted that the victims were known to leave
candles unattended. Mickey Holmes, the chief of police for Honey Grove, testified there were
candleholders located on a small table between the lamp and the sofa. (5) The lamp had been warped
from the heat, but was upright and plugged in. Holmes estimated the height of the lamp would be
approximately six feet. Holmes testified that a bong (6) and ashtrays were found in the house. (7) One
of the ashtrays was on the small table with the candleholders. Larry Phillips, a lieutenant with the
Honey Grove Police Department, testified they found "quite a bit" of drug paraphernalia. The police
found a bong, several pipes, and several joints located in ashtrays. Phillips could not recall if any
of the pipes were found in the living room. Phillips testified the joints and blunts were found in
ashtrays. Although several of the ashtrays were collected and preserved as evidence, the ashtray
located in the living room was not preserved. Phillips remembered a pole lamp with a bowl on top,
but could not recall whether it was a halogen or incandescent lamp. 

 Clinton D. Williams, the fire marshall, conducted his investigation approximately four days
after the fire. Although he did not find any candleholders during his investigation of the fire,
Williams testified he had been advised "the subjects that lived in the house did burn candles." 
Williams testified the table "was charred heaviest on the side that would have been up against the
chair." Williams opined the candles were not a likely cause of the fire based on the charring of the
table. When asked whether bulb fragments from an exploding halogen lamp could have caused a
smoldering fire in the recliner, the fire marshall stated, "Could be a possibility. I haven't seen
anything that would discount or prove either way." The fire marshall testified a dropped cigarette
butt, joint, or ashes could have caused a smoldering fire, and he could not rule out smoking materials
as a potential cause of the fire. In the fire marshall's opinion, the chair likely smoldered for a couple
of hours before it ignited into flames. The fire marshall based this opinion on "the patterns, the
Sheetrock, and the wood and the charring" as well as the burn-through in the ceiling above the
reclining chair. The lamp had been disassembled by the time the fire marshall conducted his
investigation. The pieces of the lamp were leaning against the wall. The fire marshall did not
investigate whether the lamp was a halogen lamp or what the wattage of the bulb was. The fire
marshall could not recall whether he examined the bowl of the lamp. 

 Wal-Mart retained two fire experts: Richard Dyer, the Fire Chief for Kansas City, Missouri,
and Lentini. The Parents originally hired David Dallas as an expert. Shortly before summary
judgment, the Parents retained Dr. Craig Beyler as an expert and removed Dallas' name as a
testifying expert. Both sides agree Dallas' testimony is no longer admissible, since Dallas had been
delisted, and should not be considered by this Court. Because both sides stipulate Dallas' deposition
testimony is inadmissible, we will assume the deposition testimony is inadmissible for the purpose
of this appeal. (8) About the only thing the experts could agree on was that the fire investigation was
not very thorough. 

Discussion

 The Parents brought suit for negligence, gross negligence, breach of warranty, and strict
products liability. The Parents' claims for negligence, gross negligence, and breach of warranty
involve the same underlying conduct as the strict products liability claim. At trial and on appeal,
Wal-Mart did not challenge any elements unique to negligence, gross negligence, or breach of
warranty. Here, the only alleged negligence was the selling of a defective product. In that instance,
the plaintiff must prove that the injury resulted from a defect in the product. Toshiba Int'l Corp. v.
Henry, 152 S.W.3d 774, 784-85 (Tex. App.--Texarkana 2004, no pet.) (citing Simms v. Sw. Tex.
Methodist Hosp., 535 S.W.2d 192, 197 (Tex. Civ. App.--San Antonio 1976, writ ref'd n.r.e.). In its
order granting Wal-Mart's motion, the trial court stated "all claims and causes of action asserted by
Plaintiffs against Wal-Mart shall be DISMISSED with prejudice." Because all of the Parents' causes
of action are based on a product defect and the parties have only briefed strict products liability, this
opinion will focus exclusively on strict products liability. 

 The Texas Supreme Court has adopted the Second Restatement's standard for products
liability. See Bostrom Seating, Inc. v. Crane Carrier Co., 140 S.W.3d 681 (Tex. 2004); Uniroyal
Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 335 (Tex. 1998). The Second Restatement
provides:

 (1) One who sells any product in a defective condition unreasonably dangerous
to the user or consumer or to his property is subject to liability for physical harm
thereby caused to the ultimate user or consumer, or to his property, if

 (a) the seller is engaged in the business of selling such a product, and

 (b) it is expected to and does reach the user or consumer without
substantial change in the condition in which it is sold.

 

Restatement (Second) of Torts § 402A (1965). The four elements for a products liability action
are: 

 (a) the product must be defective; (b) the product must reach the consumer without
substantial change from the time it leaves the possession and control of the
manufacturer or seller; (c) the defective condition of the product must render the
product unreasonably dangerous; and (d) the unreasonably dangerous condition of
the product must be the cause of the injury to the user. 


Toshiba, 152 S.W.3d at 778. 

 Strict products liability requires proof of producing cause. Producing cause is a cause that
is a substantial factor in bringing about an injury and without which the injury would not have
occurred. Ford Motor Co. v. Ledesma, 242 S.W.3d 32, 45 (Tex. 2007) (rejecting definition that
producing cause is "an efficient, exciting, or contributing cause that, in a natural sequence, produces
the incident in question"). In other words, the essential components of producing cause are "(1) the
cause must be a substantial cause of the event in issue and (2) it must be a but-for cause, namely one
without which the event would not have occurred." Id. 

I. The Parents' Summary Judgment Evidence Was Admissible

 Before we turn to the merits of this appeal, we are faced with the question of whether the trial
court erred in admitting all of the summary judgment evidence. The admission or exclusion of
summary judgment evidence rests with the sound discretion of the trial court. New Braunfels
Factory Outlet Ctr., Inc. v. IHOP Realty Corp., 872 S.W.2d 303, 310 (Tex. App.--Austin 1994, no
writ). Wal-Mart argues the trial court abused its discretion in overruling Wal-Mart's objections to
some of the summary judgment evidence. 

 A. The Trial Court Erred in Admitting Jay Whitlock's Unsworn Affidavit for All
Purposes


 Wal-Mart argues the trial court erred in admitting the affidavit of Whitlock. In this affidavit,
Whitlock, who was Charles II's neighbor, stated he noticed the living room lamp was still on when
he left his house "late Friday night to go play cards," i.e., the night of the fire. The affidavit, though,
is not sworn. Because the affidavit is not sworn, Wal-Mart argues the affidavit is incompetent
evidence. By statute, an affidavit must be "signed by the party making it, sworn to before an officer
authorized to administer oaths, and officially certified to by the officer under his seal of office." See
Tex. Gov't Code Ann. § 312.011(1) (Vernon 2005). An unsworn affidavit is incompetent summary
judgment evidence. See Clendennen v. Williams, 896 S.W.2d 257, 260 (Tex. App.--Texarkana
1995, no writ); see also Residential Dynamics, LLC v. Loveless, 186 S.W.3d 192, 196 (Tex.
App.--Fort Worth 2006, no pet.); Bernsen v. Live Oak Ins. Agency, Inc., 52 S.W.3d 306, 310 (Tex.
App.--Corpus Christi 2001, no pet.). The trial court erred in admitting Whitlock's affidavit for all
purposes. (9) However, as discussed below, Whitlock's affidavit was admissible for a limited purpose
as information reasonably relied upon by Dr. Beyler. 

 B. Dr. Beyler's Affidavit Was Admissible Summary Judgment Evidence

 Wal-Mart advances two reasons for excluding Dr. Beyler's affidavit. First, Wal-Mart argues
the affidavit should have been excluded because it relies on inadmissible evidence, i.e., Whitlock's
affidavit. Second, Wal-Mart argues Dr. Beyler's testimony should not have been admitted because
it was scientifically unreliable. Wal-Mart does not challenge Dr. Beyler's qualifications as an expert
witness. (10)

 1. Dr. Beyler's Affidavit Is Not Invalid Because It Relied on Hearsay

 Wal-Mart argues Dr. Beyler's affidavit is inadmissible because it relies upon the unsworn
affidavit of Whitlock. The Parents argue Dr. Beyler could reasonably rely on the statement under
Rule 703 of the Texas Rules of Evidence.

 The Texas Rules of Evidence were adopted over twenty years ago to permit experts to
consider inadmissible evidence. Traditionally, an expert could not rely upon statements of third
parties that were not properly admitted into evidence. See Moore v. Grantham, 599 S.W.2d 287, 289
(Tex. 1980). Although Moore has not been overruled, both this Court and the Texas Supreme Court
have noted it was effectively overruled by the adoption of the Texas Civil Rules of Evidence (now
the Texas Rules of Evidence). See E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549,
562-63 (Tex. 1995); Stam v. Mack, 984 S.W.2d 747, 750 (Tex. App.--Texarkana 1999, no pet.);
Baylor Med. Plaza Servs. Corp. v. Kidd, 834 S.W.2d 69, 76 (Tex. App.--Texarkana 1992, writ
denied). 

 Rule 703 expressly permits an expert to base his or her opinion upon facts or data "perceived
by, reviewed by, or made known to the expert at or before the hearing." Tex. R. Evid. 703; see In
re Christus Spohn Hosp. Kleberg, 222 S.W.3d 434, 440 (Tex. 2007) (orig. proceeding); Kidd, 834
S.W.2d at 76. "If of a type reasonably relied upon by experts in the particular field in forming
opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Tex.
R. Evid. 703. "This change was designed to broaden the basis for expert opinions and to bring
courtroom practice in line with the practice of experts themselves when they are not in court." 
Robinson, 923 S.W.2d at 563. 

 Wal-Mart cites 1 McCormick on Evidence § 15 (6th ed. 2006) (Westlaw through 2008),
for the proposition that an expert should not have reasonably relied upon Whitlock's statement. We
disagree that the treatise provides support for Wal-Mart's argument. This is not an "extreme case"
where a judge should "have a residual power to second guess the customary practice" and declare
a source untrustworthy. See id. The hypotheticals in McCormick on Evidence are clearly
distinguishable from this case. Whitlock is not an unknown bystander, nor does the statement repeat
a rumor. See id. at n.10. The veracity of Whitlock's statement can be verified, and Wal-Mart could
present contrary evidence if the statement is incorrect. An expert is not required to have personal
knowledge of the facts upon which he or she bases his or her opinion and can reasonably rely upon
the factual statements of eyewitnesses. See Sosa v. Koshy, 961 S.W.2d 420, 427 (Tex.
App.--Houston [1st Dist.] 1997, pet. denied) (expert could rely on statements by eyewitness). Wal-Mart's experts also rely on witness statements which were not introduced into the record in
admissible form (or even introduced at all). Because the trial court could reasonably conclude
Whitlock's statement was of the nature reasonably relied upon by experts, the trial court did not
abuse its discretion in admitting Dr. Beyler's affidavit. 

 2. Dr. Beyler's Affidavit Is Not Incompetent Evidence

 Wal-Mart claims Dr. Beyler's affidavit is speculative, conclusory, and scientifically
unreliable. We note that Wal-Mart failed to make a Robinson challenge (11) to Dr. Beyler in the trial
court. (12) The Texas Supreme Court has held that an objection is required "when a challenge to expert
testimony questions the underlying methodology, technique, or foundational data used by the
witness." Coastal Transp. Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227, 229 (Tex. 2004);
see Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 409 (Tex. 1998) (to "preserve a complaint that
scientific evidence is unreliable . . . a party must object to the evidence before trial or when the
evidence is offered"). 

 The Texas Supreme Court, in Coastal Transportation, explicitly refused to overrule Maritime
Overseas and explained its holding in Maritime Overseas as follows:

 We concluded that examination of the expert's underlying methodology was a task
for the trial court in its role as gatekeeper, and was not an analysis that should be
undertaken for the first time on appeal. Id. at 412. This rule allows the trial court to
exercise its discretion in making a determination of whether the expert testimony is
sufficiently reliable. Id. It also ensures that a full record will be developed, and that
appellate courts will be able to evaluate the legal and factual sufficiency of the
evidence without looking beyond the appellate record. Id.


Coastal Transp., 136 S.W.3d at 233. The court reaffirmed "that when a reliability challenge requires
the court to evaluate the underlying methodology, technique, or foundational data used by the expert,
an objection must be timely made so that the trial court has the opportunity to conduct this analysis." 
Id. By failing to raise the issue in the trial court, Wal-Mart has failed to preserve its complaints
about the methodology for review. Because error is not preserved, we decline to address these
arguments. We note Coastal Transportation held a party may challenge "[o]pinion testimony that
is conclusory or speculative" for the first time on appeal because such testimony was "incompetent
evidence." Id. at 232. We will address Wal-Mart's complaints that Dr. Beyler's testimony was
speculative and conclusory. 

 The Texas Supreme Court has held that a speculative or conclusory statement of an expert
witness is insufficient to create a question of fact to defeat summary judgment. See IHS Cedars
Treatment Ctr. of Desoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 803 (Tex. 2004); Coastal Transp.,
136 S.W.3d at 232. A naked and unsupported opinion of a witness is incompetent evidence. See
Coastal Transp. Co., 136 S.W.3d at 232. "An expert opinion is conclusory when it offers an opinion
with no factual substantiation. . . . . The expert must explain how he reached his conclusion." 
Sparks v. Booth, 232 S.W.3d 853, 863 (Tex. App.--Dallas 2007, no pet.) (citations omitted); see
Paradigm Oil, Inc. v. Retamco Operating, Inc., 242 S.W.3d 67, 74 (Tex. App.--San Antonio 2007,
pet. denied); Beaumont v. Basham, 205 S.W.3d 608, 621 (Tex. App.--Waco 2006, pet. denied). 

 In his report, Dr. Beyler states, "On the basis of the eyewitness observation, physical evidence
and analysis of the fire, the fire was caused by the halogen torchiere lamp." Wal-Mart argues this
conclusion demonstrates that Dr. Beyler's opinion is merely unsupported speculation. In Volkswagen
of America, Inc. v. Ramirez, the Texas Supreme Court held an expert's opinion was conclusory when
the expert based his opinion on the "laws of physics." 159 S.W.3d 897, 911 (Tex. 2004). When a
party challenges the conclusory nature of an expert opinion, appellate courts look to the entire record,
not to statements in isolation. United Servs. Auto. Ass'n v. Croft, 175 S.W.3d 457, 464 (Tex.
App.--Dallas 2005, no pet.). Although Dr. Beyler's statement, when considered in isolation, might
appear similar to the "laws of physics" statement in Volkswagen, consideration of the entire affidavit
and supporting attachments demonstrates that Dr. Beyler's opinion has considerably more factual
substantiation than the expert in Volkswagen.

 Dr. Beyler's affidavit specifically incorporates his report, which was attached to the affidavit. 
The affidavit states, "[t]he basis of my opinions expressed herein and in my report are more fully
developed and are contained in my report dated February 8, 2007, attached hereto." When we
consider Dr. Beyler's affidavit in connection with the attached report, there is sufficient factual
substantiation of Dr. Beyler's opinions.

 Dr. Beyler used numerous published articles to establish general causation, i.e., the fact that
halogen lamps can cause fires. Dr. Beyler listed an extensive list of articles and government reports
on which he relied. Dr. Beyler relied upon research conducted by Underwriters Laboratories (UL)
concerning halogen lamp temperatures. Dr. Beyler also relied upon sixteen articles, many of which
have been published in scientific journals. The scientific literature established four main
mechanisms by which halogen lamps can cause fires as documented by scientific literature: 
1) ignition of combustibles in close proximity, 2) ignition of combustibles by exploding lamp
fragments, 3) electrical short circuits, and 4) tip-over of the lamp resulting in ignition of
combustibles. Dr. Beyler asserts that halogen lamps operate at very high temperatures and generate
sufficient heat to allow ordinary combustibles to be ignited without direct bulb contact. Using
scientific studies, he illustrated that combustibles within two or three inches from the bulb pose a
serious risk of igniting. Logically, if the bulb itself, or fragments, come into direct contact with a
combustible, the risk of igniting would be even greater. 

 Dr. Beyler established specific causation, i.e., that Charles II's halogen lamp was the cause
of the fire, by elimination of other possible causes of the fire and evaluating the statements of the fact
witnesses along with the evidence collected at the scene. Dr. Beyler concluded the "most likely
mechanism" was "'nonpassive failure' of the lamp igniting the recliner below." Nonpassive failure
involves an exploding bulb causing hot glass, capable of igniting ordinary combustibles like
furniture, to ignite. Dr. Beyler's report contains an extensive recitation of the facts, including that
the lamp lacked a wire mesh guard, was located adjacent to the recliner, and the ceiling had been
penetrated by the fire in the area of the recliner. The report also noted that Whitlock stated the lamp
was still on when he left his house around midnight the night of the fire. Dr. Beyler noted the sofa
and small table were both damaged more extensively on the side closest to the lamp, and the halogen
lamp was extensively damaged. 

 Wal-Mart argues Dr. Beyler failed to exclude other potential causes. But Dr. Beyler did
examine and exclude the alternative causes. Dr. Beyler considered these possibilities, but rejected
the candle theory because of the disparity between the damage to the recliner and the sofa. The
pictures of the scene showed the recliner was completely consumed, but the sofa was only partially
consumed. Dr. Beyler concluded the disparity demonstrated the fire did not originate at the table
because the sofa was closer to the table. Dr. Beyler also states the candle wax would not have
survived the fire if the candles were the point of origin. The conclusion that smoking materials
caused the fire was incorrect according to Dr. Beyler. Dr. Beyler states that there is no evidence
smoking materials caused the fire and that "[t]he condition of the recliner after the fire is in no way
indicative of ignition of the recliner by a cigarette." Further, Dr. Beyler found no evidence of
electrical activities or other indicators of an electrical cause of the fire. 

 Wal-Mart argues Dr. Beyler's reasoning is inadmissible post hoc reasoning. (13) In Merrell Dow
Pharmaceuticals v. Havner, the Texas Supreme Court stated "[p]ost hoc, speculative testimony will
not suffice." 953 S.W.2d 706, 719 (Tex. 1997) (announcing requirements for epidemiological
studies to prove causation in toxic tort case). As noted by the First District, the temporal sequence
of the reasoning is not necessarily fatal. See Coastal Tankships, U.S.A., Inc. v. Anderson, 87 S.W.3d
591, 613 (Tex. App.--Houston [1st Dist.] 2002, pet. denied). The First District noted such
"reasoning is sometimes correct, sometimes fallacious" and emphasized the speculative nature of the
testimony as the relevant inquiry. Id. 

 All of the cases cited by Wal-Mart are distinguishable from the facts in this case. A number
of the cases involved reviews of Robinson challenges, which as discussed above was not preserved
for our review, and are of marginal relevance. (14) The remaining cases cited by Wal-Mart are factually
distinguishable. Borg-Warner concerned the level of proof required in toxic tort cases to show that
the exposure was a ''substantial factor'' in bringing about the plaintiff's injury and has little relevance
to this case. See Borg-Warner Corp. v. Flores, 232 S.W.3d 765 (Tex. 2007). In Ridgway, the expert
witness only testified he "suspect[ed]" the electrical system caused the fire and failed to exclude
other possible causes. Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004). The Tyler
Court of Appeals in DeGrate concluded the expert failed to provide any basis of support for his
opinion the candles were defectively designed. See DeGrate v. Executive Imprints, Inc., 261 S.W.3d
402, 411 (Tex. App.--Tyler 2008, no pet.). In Gonzales v. Shing Wai Brass & Metal Wares Factory,
Ltd., there was no evidence "explain[ing] how the lamp was defective." 190 S.W.3d 742, 746 (Tex.
App.--San Antonio 2005, no pet.). 

 At oral argument, Wal-Mart argued there was no distinction between this case and our recent
opinion in Driskill v. Ford Motor Co., No. 06-07-00119-CV, 2008 Tex. App. LEXIS 7910 (Tex.
App.--Texarkana Oct. 17, 2008, no pet.). We believe the distinctions between this case and Driskill
are profound. In Driskill, the plaintiff's expert witness was disqualified and there was no expert
testimony "bridging the analytical gap between the origin of a fire in the left rear area of an engine
compartment and the conclusion that the [speed control deactivation switch] in that area was the
cause-in-fact of the fire." Id. This case does not contain the "analytical gap" which proved fatal in
Driskill. Dr. Beyler's affidavit provides expert testimony bridging the analytical gap between the
origin of the fire in the general area of the lamp and the conclusion that the halogen lamp was the
cause-in-fact of the fire. There is more than a scintilla of evidence bridging the analytical gap.

 It is clear that Wal-Mart's experts disagree with the conclusions reached by Dr. Beyler. 
Conclusory evidence lacks probative value due to insufficient factual substantiation--not from
"differing conclusions as to the underlying factual situation." See Brandt v. Surber, 194 S.W.3d 108,
132 (Tex. App.--Corpus Christi 2006, pet. denied). The fact that an expert witness may have made
errors does not create an impermissible "analytical gap." See SAS & Assocs. v. Home Mktg.
Servicing, 168 S.W.3d 296, 300 (Tex. App.--Dallas 2005, pet. denied). While Dr. Beyler's analysis
is not irrefutable, Dr. Beyler did provide factual substantiation for his opinions. Dr. Beyler's
opinions were based on his knowledge, training, and experience as an expert in fire science and fire
investigation, his review of the pictures of the scene, the statements of the fact witnesses, and
numerous published articles. The evidence is not speculative or conclusory and does not contain an
impermissible "analytical gap" between the data and the conclusions. Dr. Beyler's testimony is not
incompetent evidence. 

 C. Timeliness and Specificity of Self-Authentication of Wal-Mart Documents Wal-Mart claims the Parents' exhibits 4 and 14 through 17 were not competent summary
judgment evidence because they were not authenticated. In its appellee's brief and its objections to
the Parents' summary judgment evidence, Wal-Mart argued to the trial court that it did not receive
the ten days' notice required for self-authentication by Rule 193.7 of the Texas Rules of Civil
Procedure. See Tex. R. Civ. P. 193.7. The Parents responded that the exhibits were
self-authenticated under the rule by a notice provided seventeen months before the summary
judgment. The Parents filed a document titled "Notice of Self Authentication Pursuant to Rule
193.7, Tex. R. Civ. P.," which provides in pertinent part: 

 Please take notice that the documents you produced in response to all parties' Request
for Production of Documents are authenticated pursuant to Rule 193.7, TEX. R.
CIV. P., and will be used by Plaintiff at any trial or hearing. 


Clearly, Wal-Mart received more than ten days' notice.

 In their response to the Parents' reply brief, Wal-Mart states it was represented by different
counsel at the time of the notice and was not aware of the above notice. Wal-Mart, in the alternative,
argues the above notice lacked sufficient specificity under the rule. According to Wal-Mart, the
notice must list every document to be used by the document's title, etc. Such a requirement is not
found in the text of the rule. Rule 193.7 provides in its entirety:

 A party's production of a document in response to written discovery authenticates the
document for use against that party in any pretrial proceeding or at trial
unless--within ten days or a longer or shorter time ordered by the court, after the
producing party has actual notice that the document will be used--the party objects
to the authenticity of the document, or any part of it, stating the specific basis for
objection. An objection must be either on the record or in writing and must have a
good faith factual and legal basis. An objection made to the authenticity of only part
of a document does not affect the authenticity of the remainder. If objection is made,
the party attempting to use the document should be given a reasonable opportunity
to establish its authenticity.


Tex. R. Civ. P. 193.7. Wal-Mart proposes two arguments as to why we should infer a specificity
requirement into the rule.

 First, Wal-Mart argues the snap-back provisions of Rule 193.3(d) require such a requirement. 
See Tex. R. Civ. P. 193.3(d). Wal-Mart argues the notice of intent to use the document "also triggers
the ability to 'snap back' an inadvertently produced privileged document." Second, Wal-Mart argues
the comments to the rule indicate the notice must specify the document by title. The only comment
referencing Rule 193.7 is as follows:

 7. The self-authenticating provision is new. Authentication is, of course, but a
condition precedent to admissibility and does not establish admissibility. See Tex.
R. Evid. 901(a). The ten-day period allowed for objection to authenticity (which
period may be altered by the court in appropriate circumstances) does not run from
the production of the material or information but from the party's actual awareness
that the document will be used. To avoid complications at trial, a party may identify
prior to trial the documents intended to be offered, thereby triggering the obligation
to object to authenticity. A trial court may also order this procedure. An objection
to authenticity must be made in good faith.


Tex. R. Civ. P. 193 cmt. 7. Wal-Mart claims the language "may identify" creates a specificity
requirement that requires a party to list the specific document he or she intends to use. 

 Assuming, without deciding, the rule contains a specificity requirement, Wal-Mart has
waived any error. The Parents filed the notice of self-authentication approximately seventeen
months before summary judgment. If Wal-Mart had any complaints concerning the notice, it should
have raised those complaints in the trial court at a time when any deficiency could have been
remedied. Wal-Mart did not raise its specificity complaint until it filed its response to the Parents'
reply brief. "Silence or inaction, for so long a period as to show an intention to yield the known
right," may be sufficient to establish a waiver of that right. Tenneco Inc. v. Enter. Prods. Co., 925
S.W.2d 640, 643 (Tex. 1996). Wal-Mart had seventeen months in the trial court to complain about
the notice of self-authentication. Wal-Mart waived any complaints by not objecting to the specificity
of the notice in the trial court.

II. The Trial Court Erred in Granting the No-Evidence Motion

 Wal-Mart argues there are numerous deficiencies in the Parents' evidence. "A product may
be unreasonably dangerous because of a defect in manufacturing, design, or marketing." Uniroyal
Goodrich Tire Co., 977 S.W.2d at 335. Wal-Mart claims there is no evidence the lamp was a
halogen lamp, no evidence the lamp was purchased at a Wal-Mart store, no evidence the lamp
contained a design defect, and no evidence of a marketing defect. 

 A no-evidence summary judgment is essentially a pretrial directed verdict. We, therefore,
apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply
in reviewing a directed verdict. Wal-Mart Stores, Inc. v. Rodriguez, 92 S.W.3d 502, 506 (Tex.
2002). We must determine whether the nonmovant produced any evidence of probative force to
raise a fact issue on the material questions presented. Id.; Vial v. Gas Solutions, Ltd., 187 S.W.3d
220, 228 (Tex. App.--Texarkana 2006, no pet.). A no-evidence 

 motion for summary judgment must be granted if: (1) the moving party asserts that
there is no evidence of one or more specified elements of a claim or defense on
which the adverse party would have the burden of proof at trial; and (2) the
respondent produces no summary judgment evidence raising a genuine issue of
material fact on those elements.

 

Sudan v. Sudan, 199 S.W.3d 291, 292 (Tex. 2006); see Tex. R. Civ. P. 166a(i).

 A nonmovant will defeat a no-evidence summary judgment motion if the nonmovant presents
more than a scintilla of probative evidence on each element of his or her claim. DR Partners v.
Floyd, 228 S.W.3d 493 (Tex. App.--Texarkana 2007, pet. denied); Price v. Divita, 224 S.W.3d 331,
336 (Tex. App.--Houston [1st Dist.] 2006, pet. denied). The final test for legal sufficiency must
always be whether the evidence at trial would enable reasonable and fair-minded people to reach the
verdict under review. City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). More than a
scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and
fair-minded people to differ in their conclusions." Havner, 953 S.W.2d at 711. "Less than a scintilla
of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or
suspicion' of a fact." King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003) (quoting
Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983)).

 A. There Is Some Evidence the Lamp Was a Halogen Lamp

 Wal-Mart argues there is no evidence the lamp purchased by Merrell for his son was a
halogen lamp. A halogen lamp uses "halogen gas in the bulb as a media for producing the light." 
An incandescent bulb consists of a sealed vacuum. The proof of this fact is critical to the Parents'
case. Without evidence the lamp was a halogen lamp, there is no evidence of a product defect or
causation.

 Merrell provided some evidence that the lamp was actually a halogen lamp. During the
deposition, Merrell testified the lamp he purchased for his son was a halogen lamp and frequently
referred to the lamp as a halogen lamp. Merrell also testified he could distinguish the difference
between an incandescent bulb and a halogen bulb. Merrell described the bulb in the lamp as a
"round cylinder looking bulb"--"[n]ot like a regular light bulb." According to Merrell, a halogen
bulb is normally cylindrical, and an incandescent bulb is normally round. Merrell, though, testified
he did not know the wattage of the bulb. Merrell testified he had seen the lamp in that location about
a month before the fire, and "it was like looking at the sun." 

 J. M. Bershirs, who had been hired by the landlord to remove items from the burned house,
testified that the bulb on the lamp he removed from the living room was "more flat on the surface
and then round at the back." Bershirs testified the bulb was similar to a flood lamp. Bershirs later
identified a drawing of a bulb as similar to the bulb in the lamp. Bershirs testified he was not sure
whether the bulb was a halogen or incandescent bulb. 

 The evidence that the lamp at issue was a halogen lamp is more than a mere suspicion or
surmise. Merrell's testimony is more than a scintilla of evidence the lamp at issue was a halogen
lamp. The description of the bulb by Bershirs also suggests the lamp was a halogen lamp. We
conclude there is more than a scintilla of evidence the lamp at issue was a halogen lamp.

 B. There Is Some Evidence the Halogen Lamp Was Purchased at Wal-Mart

 Wal-Mart argues there is no evidence that the lamp was purchased at Wal-Mart because the
Parents do not have any document establishing the purchase. Merrell testified that he purchased the
lamp at a Wal-Mart store even though he did not remember the location. Merrell's testimony that
he purchased the lamp at Wal-Mart is sufficient to create a fact issue.

 C. There Is Some Evidence of a Design Defect

 Wal-Mart argues there is no evidence of a design defect. We note Wal-Mart also argues the
Parents waived this issue by failing to provide this Court with an adequate brief. (15) We also note the
Parents claim Wal-Mart waived this issue by not raising it in the trial court. (16) 

 A design defect exists when a condition of the product renders it "'unreasonably dangerous
as designed, taking into consideration the utility of the product and the risk involved in its use.'" 
Hernandez v. Tokai Corp., 2 S.W.3d 251, 258 (Tex. 1999) (quoting jury instruction contained in
Turner v. Gen. Motors Corp., 584 S.W.2d 844, 847 n.1 (Tex. 1979)). "'The inference of defect may
not be drawn . . . from the mere fact of a product-related accident.'" Ridgway, 135 S.W.3d at 602
(quoting Restatement (Third) of Torts: Products Liability § 3 reporters' note to cmt. d (1998)); see
Cooper Tire & Rubber Co. v. Mendez, 204 S.W.3d 797, 807 (Tex. 2006). 

 We note a design defect also requires proof of a safer alternative design. Tex. Civ. Prac.
& Rem. Code Ann. § 82.005 (Vernon 2005); Mendez, 204 S.W.3d at 807; see Jaimes v. Fiesta Mart,
Inc., 21 S.W.3d 301, 306 (Tex. App.--Houston [1st Dist.] 1999, pet. denied); Hernandez, 2 S.W.3d
at 256 (noting "Section 82.005 does not attempt to state all the elements of a product liability action
for design defect"). Wal-Mart, though, did not challenge the evidence concerning a safer alternative
design. (17) 

 1. There Is Some Evidence of a Product Defect

 According to Dr. Beyler, all halogen lamps are defective and unreasonably dangerous because
typical "lamp envelope" temperatures are between 500 and 600 degrees Celsius (932 and 1,112
degrees Fahrenheit). There are four main mechanisms by which halogen lamps can cause fires as
documented by scientific literature: 1) ignition of combustibles in close proximity; 2) ignition of
combustibles by exploding lamp fragments; 3) electrical short circuits; and 4) tip-over of the lamp
resulting in ignition of combustibles. There is more than a scintilla of evidence that the lamp
contained a product defect. 

 2. There Is Some Evidence Halogen Lamps Are Unreasonably Dangerous

 Wal-Mart challenges the evidence that halogen lamps are unreasonably dangerous. 
Dr. Beyler's affidavit contains some evidence of this element. The Parents introduced numerous
articles showing halogen lamps produce high levels of heat. A memorandum from the Commission
lists these dangers. The memorandum was the result of 260 reported incidents involving halogen
torchiere floor lamps. The study included 232 fires caused by halogen torchiere-style floor lamps,
of which twelve resulted in deaths. 

 The unreasonably dangerous concept is similar to the safer alternative design discussion
above, but has a slightly different focus. Even though a product may have a safer alternative design,
the product may not be unreasonably dangerous based on a risk-utility analysis. See Hernandez,
2 S.W.3d at 256. The risk-utility analysis employed by Texas courts involves consideration of
several factors, including:

 (1) the utility of the product to the user and to the public as a whole weighed against
the gravity and likelihood of injury from its use; (2) the availability of a substitute
product which would meet the same need and not be unsafe or unreasonably
expensive; (3) the manufacturer's ability to eliminate the unsafe character of the
product without seriously impairing its usefulness or significantly increasing its
costs; (4) the user's anticipated awareness of the dangers inherent in the product and
their avoidability because of the general public knowledge of the obvious condition
of the product, or of the existence of suitable warnings or instructions, and (5) the
expectations of the ordinary consumer.

 

Id. (citing Am. Tobacco Co. v. Grinnell, 951 S.W.2d 420, 432 (Tex. 1997)). 

 Wal-Mart argues that the Parents' proof, which only attacks halogen torchiere lamps in
general, does not establish that the product is unreasonably dangerous. Wal-Mart claims the model
sold must be unreasonably dangerous in comparison to other halogen torchiere lamps. A rational
juror could conclude that an incandescent torchiere lamp is an adequate substitute for a halogen
torchiere lamp and determine, using the above factors, that the utility of halogen lights does not
outweigh its dangers. There is some evidence of unreasonable danger.

 3. There Is Some Evidence of Causation

 Wal-Mart claims there is no evidence the lamp in dispute caused the fire. Wal-Mart argues
the Parents cannot prove causation without producing the actual lamp. While we agree the missing
lamp makes the Parents' case much more difficult to prove, its absence does not make the case
impossible to prove. We have previously discussed the testimony of Dr. Beyler supporting the claim
that the halogen lamp was the cause of the fire. 

 As discussed above, Dr. Beyler opined the fire was most likely caused by the halogen lamp
and substantiated his opinion with an analysis of the fire, physical evidence, and observations. 
Dr. Beyler used numerous published articles to establish that halogen lamps can cause fires. Based
on the data and statistics contained in the published articles, Dr. Beyler concluded "halogen lamps
generate sufficient heat to allow ordinary combustibles to be ignited without direct bulb contact." 
Dr. Beyler concluded the most likely mechanism is "'nonpassive failure' of the lamp igniting the
recliner below." He reached this conclusion by eliminating the other possible causes of the fire and
analyzing the statements of the fact witnesses along with the evidence gathered at the scene. We
further note the ceiling burn-through was not directly over the recliner, but rather approximately two
feet from the recliner. Dr. Beyler's testimony was based on the condition of the recliner, sofa, and
table after the fire. 

 The Parents were not required to marshal all of their evidence at the summary judgment
stage. See Tex. R. Civ. P. 166a (cmt.). The Parents only had to produce a scintilla of evidence. 
There is some evidence the lamp was a substantial factor in bringing about an injury and without the
lamp, the injury would not have occurred. 

 D. There Is Some Evidence of a Marketing Defect

 A ''marketing defect'' exists if the manufacturer or seller fails to warn of a dangerous
characteristic of the product. A marketing defect may exist even though the product is not otherwise
flawed. Munoz v. Gulf Oil Co., 732 S.W.2d 62, 65 (Tex. App.--Houston [14th Dist.] 1987, writ
ref'd n.r.e.). A marketing defect consists of five elements: 

 (1) a risk of harm that is inherent in the product or that may arise from the intended
or reasonably anticipated use of the product must exist; (2) the product supplier must
actually know or reasonably foresee the risk of harm at the time the product is
marketed; (3) the product must possess a marketing defect; (4) the absence of the
warning and/or instructions must render the product unreasonably dangerous to the
ultimate user or consumer of the product; and (5) the failure to warn and/or instruct
must constitute a causative nexus in the product user's injury.


Goodyear Tire & Rubber Co. v. Rios, 143 S.W.3d 107, 116 (Tex. App.--San Antonio 2004, pet.
denied). 

 As discussed above, the record contains ample evidence halogen lamps are defective. There
is some evidence establishing that Wal-Mart was aware of the risk of harm. The record contains
several memorandums and other documents concerning Wal-Mart's implementation of a requirement
imposed by the Commission that all retailers make available without cost, a wire mesh guard for all
halogen torchiere lamps. However, Wal-Mart did not provide a wire mesh guard with the lamp. 
Merrell testified Wal-Mart sold the lamp without a box or adequate warnings. A rational juror could
conclude a causative nexus existed between the failure to warn and/or instruct and Charles II's death. 
There is more than a scintilla of evidence establishing a marketing defect.

III. The Trial Court Erred in Granting the Traditional Motion for Summary Judgment

 Wal-Mart's motion was both a no-evidence and a traditional motion for summary judgment. 
The Parents argue that Wal-Mart failed to conclusively establish that the lamp was not purchased
at Wal-Mart, that the lamp was an incandescent lamp, or that smoking materials were the cause of
the fire. We agree the trial court erred in granting the traditional motion for summary judgment.

 When reviewing a traditional motion for summary judgment, summary judgment is proper
when the movant establishes that there is no genuine issue of material fact and that he or she is
entitled to judgment as a matter of law. Clear Creek Basin Auth., 589 S.W.2d 671; see Tex. R. Civ.
P. 166a(c). The defendant must conclusively negate at least one element of each of the plaintiff's
theories of recovery or plead and conclusively establish each element of an affirmative defense. 
Martinez, 941 S.W.2d at 911. Because the movant bears the burden of proof, all conflicts in the
evidence are disregarded, evidence favorable to the nonmovant is taken as true, and all doubts as to
the genuine issues of material fact are resolved in favor of the nonmovant. Nixon v. Mr. Prop. Mgmt.
Co., 690 S.W.2d 546 (Tex. 1985); see Limestone Prods. Distribution, Inc. v. McNamara, 71 S.W.3d
308, 311 (Tex. 2002); Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223 (Tex. 1999). 

 A. Wal-Mart Did Not Conclusively Negate That the Lamp Was Purchased at Wal-Mart


 Wal-Mart introduced an affidavit of Jim Scantlin, the Director of Data Management for Wal-Mart. Scantlin searched Wal-Mart's records for a record of Merrell's purchase. Scantlin testified he
reviewed 95,000 sales records from the three locations in question and could not find a sale that
matched Merrell's description. A jury would not be required to find all of Scantlin's testimony to be
credible. As a Wal-Mart employee, Scantlin was an interested witness. In addition, Scantlin
restricted his search to specific dates, product features, and other criteria. Merrell's purchase could
have been outside these dates or the other search limitations. The Parents argue a purchase on
October 8 could have been the purchase of the lamp in question. This date was outside the search
dates used by Scantlin. Last, Merrell testified he purchased the lamp at Wal-Mart. While Wal-Mart
has persuasive evidence, it has not conclusively established the lamp was not purchased at Wal-Mart. 
There are genuine issues of material fact concerning whether the lamp was purchased at Wal-Mart.

 B. Wal-Mart Did Not Conclusively Negate That the Lamp Was a Halogen Lamp


 Both Lentini and Dyer testified the lamp was an incandescent lamp. Lentini testified the two
photographs of the lamp were of an incandescent fixture, not a halogen fixture. From the
descriptions of the lamp and the photographs, Dyer concluded the lamp indicated was an
incandescent, rather than a halogen, lamp. Dyer testified the shape of the bowl indicates the lamp
was an incandescent lamp. The record, though, contains evidence contradicting the conclusions
reached by Lentini and Dyer. In its summary judgment motion, Wal-Mart admits the photographs
of the lamp are "blurry" and "fuzzy." Phillips testified a person could buy both incandescent lamps
and halogen lamps similar to the appearance of the lamp in dispute. As discussed above, Merrell
testified the lamp was a halogen lamp. Wal-Mart admitted selling halogen lamps. The testimony
of an expert witness usually does not establish any fact as a matter of law. See Uniroyal Goodrich
Tire Co., 977 S.W.2d at 338. Wal-Mart failed to conclusively establish the lamp was an
incandescent lamp.

 C. Wal-Mart Did Not Conclusively Establish the Marihuana Joints Caused the
Fire


 Wal-Mart argues throughout its brief that the marihuana joints or cigarettes caused the fire. 
Wal-Mart, though, has not conclusively established this fact. Lentini concluded the most probable
cause of the fire was careless disposal of smoking materials. Dyer testified the cause of the fire
could not be determined due to the lack of a thorough fire investigation and the significant amount
of missing elements of key evidence. 

 The presence of smoking materials is not conclusive evidence they were the cause of the fire. 
Neither is the presence of cannabinoids in the blood of the victims. Dr. Beyler disagreed with the
conclusion that marihuana joints or other smoking materials caused the fire. While Lentini opined
the fire was caused by smoking materials, such testimony only creates a fact issue for a jury's
consideration. In other words, Wal-Mart's evidence creates a fact issue--not conclusive proof. 

Conclusion

 The trial court did not err in admitting all the summary judgment evidence. Although
Whitlock's affidavit was not admissible for all purposes, Dr. Beyler could rely upon Whitlock's
statement in his affidavit. Dr. Beyler's affidavit was not speculative or conclusory. Because the
Parents introduced more than a scintilla of evidence on each challenged element of their cause of
action, the trial court erred in granting Wal-Mart's no-evidence motion for summary judgment. 
Further, Wal-Mart failed to establish it was entitled to a traditional summary judgment. We reverse
the order of the trial court granting Wal-Mart's summary judgment motion and remand this case to
the trial court for further proceedings consistent with this opinion.




 Jack Carter

 Justice


Date Submitted: October 29, 2008

Date Decided: December 16, 2008




OPINION ON REHEARING


 Wal-Mart Stores, Inc., has filed a motion for rehearing in which Wal-Mart argues, among
other things, that our opinion "erroneously states that Wal-Mart stipulated to the inadmissibility of
the testimony of Plaintiffs' first expert, David Dallas." In our opinion, we stated: "[b]oth sides agree
Dallas' testimony is no longer admissible, since Dallas had been delisted, and should not be
considered by this Court." Merrell v. Wal-Mart Stores, Inc., No. 06-07-00122-CV, 2008 Tex. App.
LEXIS 9278, at *6 (Tex. App.--Texarkana Dec. 16, 2008, no pet. h.). Wal-Mart claims this
statement was in error. According to Wal-Mart, it "agreed only that Plaintiffs had de-designated
Dallas, but that the substance of his testimony remained in the record on appeal."

 The audio recording of the oral argument in this case supports the statement in our original
opinion. During oral argument, Wal-Mart's trial counsel affirmatively represented that Dallas'
testimony should not be considered. While discussing Dallas' testimony, the following colloquy
occurred between the Court and Wal-Mart's appellate counsel:

 [Justice Carter]: Is that evidence before the Court?


 [Wal-Mart's Counsel]: No, Your Honor. But it's significant in this -- that at the time
that Wal-Mart moved for summary judgment he was the designated expert . . .


 . . . .


 [Justice Carter]: . . . Are both of those experts still -- evidence still -- in the record for
summary judgment purposes?


 [Wal-Mart's Counsel]: No, Your Honor. The original expert's report is in the record, 
but he was dedesignated and so the report that - you know - essentially serves as
plaintiff's evidence here is Dr. Beyler, the second expert . . . .

 

After reviewing the audio recording, this Court is convinced that it did not err in representing that
Wal-Mart had agreed Dallas' testimony was no longer admissible for summary judgment purposes
and should not be considered by this Court. 

 The remaining arguments advanced by Wal-Mart are overruled for the reasons stated in our
original opinion. Wal-Mart's motion for rehearing is denied.



 Jack Carter

 Justice


Date: January 23, 2009

1. Merrell brought suit in his capacity as a wrongful death beneficiary of Charles Thomas
Merrell, II, deceased, and as representative of the Estate of Charles Thomas Merrell, II, deceased. 
Jane Cerverny brought suit in her capacity as wrongful death beneficiary of Charles Thomas
Merrell, II, deceased. 
2. The Parents also brought suit against the Holmes Group, a manufacturer of halogen torchiere
lamps, and Wilma Pearce, the landlord. The Parents alleged that Pearce failed to equip the residence
with a smoke detector. In addition, Wal-Mart brought a cross-claim for indemnity and contribution
against Pearce for failing to install a smoke detector. The Parents' claims against Wal-Mart were
severed from the rest of the case after the trial court granted Wal-Mart's motion for summary
judgment. 
3. Merrell testified the lamp was a dark color. He believed the lamp was black, but it could
have been dark blue or dark green. 
4. After the fire, the burned lamp was disposed of. After searching a number of dumpsters,
Merrell offered a reward for the lamp. Joe Williams, who had been hired to cover the windows of
the house with plywood, and Royce "Stoney" Mackey presented Merrell with a destroyed lamp and
collected the reward. John Lentini, Wal-Mart's expert, discovered traces of gasoline on the lamp. 
In addition, the lamp presented by Williams only contained two tubular vertical pieces while the
photograph at the scene showed the lamp contained three pieces. In his deposition, Williams
admitted they burned another lamp and misrepresented that it was from the fire. Williams admitted
to having a criminal record. Wal-Mart emphasizes this fraud, but there is no evidence Merrell
participated in the deception. 
5. The officers collected the candleholders and other evidence, but a number of the items
collected are now missing, including the candleholders. The videotape taken at the scene and some
of the photographs are also missing. 
6. A smoking device.
7. Although there is no evidence Charles II smoked cigarettes, there is some evidence that
Gibson smoked cigarettes.
8. This conclusion has not been briefed, and we do not express an opinion as to whether the
conclusion reached by both sides is correct.
9. To obtain a reversal of the judgment, appellant must first show that the trial court did in fact
commit error, and second that the error was reasonably calculated to cause and probably did cause
the rendition of an improper verdict. Gee v. Liberty Mut. Fire Ins. Co., 765 S.W.2d 394, 396 (Tex.
1989). There is no reversible error if the evidence in question is cumulative or is not controlling on
a material issue dispositive of the case. Id.; Sanders v. Shelton, 970 S.W.2d 721, 727 (Tex.
App.--Austin 1998, pet. denied). This error would not be reversible.
10. Summary judgment evidence must establish the witness' qualifications as an expert. Hall
v. Huff, 957 S.W.2d 90, 99-102 (Tex. App.--Texarkana 1997, pet. denied). The summary judgment
evidence indicates Dr. Beyler is qualified as an expert. Dr. Beyler has bachelor's degrees in civil
engineering and fire protection engineering, master's degrees in mechanical engineering and fire
safety engineering, and a Ph.D. in engineering science. In addition, Dr. Beyler lists approximately
three pages of published articles and has over twenty-five years of experience in the field. 
11. The trial court must make a threshold determination of the admissibility of expert testimony
under Rule 702. Tex. R. Evid. 702; Robinson, 923 S.W.2d at 556. To be reliable, the scientific
techniques or principles underlying the expert's testimony must be well grounded in the methods and
procedures of science. Robinson, 923 S.W.2d at 557. In determining the reliability of an expert's
testimony, a trial court may consider the following nonexhaustive list of factors: (1) the extent to
which the theory has been or can be tested; (2) the extent to which the techniques rely on the
subjective interpretation of the expert; (3) whether the theories have been subjected to peer review
and/or publication; (4) the techniques' potential rate of error; (5) whether the underlying theories or
techniques have been generally accepted as valid by the relevant scientific community; and (6) the
nonjudicial uses which have been made of the theories or techniques. Id. The Texas Supreme Court
has noted the factors listed in Robinson do not apply with equal force to all types of scientific or
technical evidence. See Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 726 (Tex. 1998). 
We review the trial court's decision on a Robinson challenge for an abuse of discretion. Robinson,
923 S.W.2d at 558; Tucker's Beverages, Inc. v. Fopay, 145 S.W.3d 765, 767 (Tex. App.--Texarkana
2004, no pet.). 
12. Wal-Mart objected to Dr. Beyler's affidavit in its "Objections to Summary Judgment
Evidence in Support of Plaintiffs' Response." Wal-Mart complained that Dr. Beyler's affidavit
contained hearsay, was speculative, and was conclusory. Wal-Mart, though, did not complain about
the scientific reliability of the affidavit and did not cite Daubert, Robinson, or their progeny. See
Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590 (1993); Robinson, 923 S.W.3d 549.
13. Dr. Beyler's testimony is "post hoc" only in that he proposes several hypotheses, and then
examines each in turn. This is not inadmissible reasoning; this is the scientific method.
14. Gammill, 972 S.W.2d at 726 (applying Robinson to technical rather than scientific expert
testimony); Havner, 953 S.W.2d at 712 (applying Robinson in the context of epidemiological
studies); Robinson, 923 S.W.2d at 556; Wolfson v. Bic Corp., 95 S.W.3d 527, 532 (Tex.
App.--Houston [1st Dist.] 2002, writ denied). Wal-Mart also cites two federal cases. These cases
do not rely upon Texas caselaw and have marginal, if any, persuasive value. See Bryte v. Am.
Household, Inc., 429 F.3d 469 (4th Cir. 2005); Lanza v. Poretti, 537 F. Supp. 777 (E.D. Pa. 1982).
15. Wal-Mart argues the Appellants' brief lacks sufficient citations to authority. An appellant
can waive an issue by failing to provide adequate citations to authority. See Tex. R. App. P. 38.1;
Save Our Springs Alliance, Inc. v. Lazy Nine Mun. Util. Dist., 198 S.W.3d 300, 314 n.9 (Tex.
App.--Texarkana 2006, pet. denied). Whether a party has provided adequate citations to authority
is not judged by the quantity of cases cited. What constitutes adequate citations to authority depends
on the issue raised. For some issues, citing a single case may be adequate briefing. See Save Our
Springs, 198 S.W.3d at 324 (op. on reh'g). For complex issues or issues where the law is unsettled,
numerous cases along with extensive discussion of those cases may be required in order to
adequately brief the issue. See id. The Parents provided adequate authority for the arguments raised. 
While the authority cited by the Appellants' brief could have been more extensive, the brief is not
inadequate. 
16. A movant must establish his or her entitlement to a summary judgment on the issues
expressly presented to the trial court. City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671
(Tex. 1979). Wal-Mart, though, did expressly present this issue to the trial court in its motion for
summary judgment. Wal-Mart's motion contains three main complaints: 1) no evidence the lamp
was purchased at Wal-Mart; 2) no evidence the lamp was "defective and/or unreasonably
dangerous"; and 3) no evidence a product defect caused the injury. Wal-Mart argued there was no
evidence of a product defect because a product defect cannot be inferred, and "an inherent risk (such
as a high temperature bulb)" is not evidence the product is unreasonably dangerous. Wal-Mart's
challenge to the design defect is preserved, but Wal-Mart is limited to the grounds alleged in its
motion. 
17. Wal-Mart did not argue there was no evidence of a safer alternative design, nor did Wal-Mart argue its evidence conclusively established there was no safer alternative design. Summary
judgment cannot be granted except on the grounds expressly presented in the motion. Johnson v.
Brewer & Pritchard, P.C., 73 S.W.3d 193, 204 (Tex. 2002); Sci. Spectrum, Inc. v. Martinez, 941
S.W.2d 910, 912 (Tex. 1997); McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337, 342 (Tex.
1993); AIG Life Ins. Co. v. Federated Mut. Ins. Co., 200 S.W.3d 280, 284 (Tex. App.--Dallas 2006,
pet. denied); Thomas v. Omar Invs., Inc., 156 S.W.3d 681, 685 (Tex. App.--Dallas 2005, no pet.). 
Rule 166a(i) provides "[t]he motion must state the elements as to which there is no evidence." Tex.
R. Civ. P. 166a(i). "A motion for summary judgment must itself expressly present the grounds upon
which it is made, and must stand or fall on these grounds alone." Martinez, 941 S.W.2d at 912
(quoting McConnell, 858 S.W.2d at 341). The appellate court is not permitted to "read between the
lines, infer or glean from the pleadings or the proof" any grounds for granting summary judgment
other than those grounds expressly set forth in the motion for summary judgment. McConnell, 858
S.W.2d at 343; Mott v. Red's Safe & Lock Servs., Inc., 249 S.W.3d 90, 98 (Tex. App.--Houston [1st
Dist.] 2007, no pet.) (motion which alleged there was no evidence the product "was unfit for the
purposes for which it was intended . . . ." was insufficient to challenge existence of product defect
or unreasonably dangerous condition). Because Wal-Mart failed to challenge the evidence
concerning a safer alternative design in its summary judgment motion, summary judgment could not
be granted on that basis. Further, we note Dr. Beyler stated incandescent and flourescent bulbs do
not generate temperatures as high as halogen bulbs. Lentini and Phillips both testified similar lamps
with incandescent bulbs were available.